UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DARRIN KENNY LEWIS, SR.                          CIVIL ACTION

VERSUS

ASCENSION PARISH SCHOOL                          NO.: 08-00193-BAJ-RLB
BOARD

## RULING AND ORDER

Before the Court is a **Motion for Summary Judgment (Doc. 107)**, filed by

Plaintiff Darrin Kenny Lewis, Sr., seeking an order from this Court granting Plaintiffs[1]

summary judgment, pursuant to Federal Rule of Civil Procedure ("Rule") 56.

Defendant Ascension Parish School Board (the "School Board") opposes the motion.[2]

(Doc. 120.) Also before the Court is a **Motion for Summary Judgment (Doc. 108)**,

filed by the School Board, seeking an order from this Court granting it summary

judgment, pursuant to Rule 56. Lewis opposes the motion. (Doc. 119.) Both motions

were heard with oral argument on September 18, 2013. (Doc. 161.) Jurisdiction is

proper pursuant to 28 U.S.C. § 1331.

---

[1] Lewis is named individually, and as a natural tutor of his minor child, "Child B." Since the filing of the state court Petition, "Child A" reached the lawful age of majority, and is now named as Plaintiff Oscar Varnado.

[2] Lewis subsequently filed a reply memorandum. (Doc. 130.) In response, the School Board filed a sur-reply memorandum. (Doc. 135.)

## I.    Background

The facts of this case are well known to the Court and the parties, and were set out in detail in the United States Court of Appeals' 2011 opinion.  *See Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 352 (5th Cir. 2011).  However, for purposes of this ruling and order, the Court sets out the following facts.

### A.    Undisputed Facts

The Ascension Parish School District (the "District") is a political subdivision of the State of Louisiana, governed by the School Board.  The District operates four high schools in Southeast Louisiana: Donaldsonville High School[3] on the west bank of the Mississippi River, and East Ascension High School, Dutchtown High School, and St. Amant High School on the east bank.  The District assigns students to these schools through an attendance-zone-based "feeder plan," whereby specified elementary schools "feed" into specified middle schools, which in turn "feed" into one of the high schools.

In 2004, this Court dismissed a longstanding desegregation case against the District, and declared the District unitary.[4]  *See Charles v. Ascension Parish Sch. Bd.*, Civil Action No. 65-3257-JVP (M.D. La.).  As a result, the School Board regained the ability to assign students within the District, pursuant to its authority under Louisiana Revised Statute § 17:81.

---

[3] Donaldsonville High School is not at issue in this matter.

[4] Unitary status means that a school district has abandoned the "dual" status of "intentional segregation of students by race" and "has been brought into compliance with the command of the Constitution."  *Freeman v. Pitts*, 503 U.S. 467, 487 (1992) (internal quotation marks omitted).  It signifies, in other words, that a district has "eliminated the vestiges of prior segregation to the greatest extent practicable" with respect to legally imposed segregation, although it does not mean that, as a factual matter, all district schools contain a racially diverse mix of students.  *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 701, 715-16, 720-21 (2007).

In 2002, the School Board opened Dutchtown High School to address substantial population growth in the Dutchtown area of East Ascension Parish. By 2006, the enrollment at Dutchtown Middle School, a Dutchtown High School feeder school, had risen to over 1,000 students. No other east bank middle school had more than 730 students enrolled.

In 2004, the School Board established the "Growth Impact Committee" to address the concerns of the Parish's growing student population. The "Growth Impact Charter" stated objectives included: (1) to develop a plan to address the growth with minimal impact on residents; (2) to ensure equal facilities and instructional quality for all children in the Parish; (3) to attain enrollment maximums for each school level; and (4) to maintain unitary status. Over the course of months, the School Board and the "Growth Impact Committee" held public hearings and meetings during which they gave the public the opportunity to comment, discuss, question, and/or challenge the proposed rezoning plans and/or propose alternative rezoning plans. According to Superintendent Donald Songy ("Songy"), the District sought to move approximately 450 students from Dutchtown Middle School, and thus out of Dutchtown High School's feeder zone, to other East Bank schools with capacity for growth.

Prior to the School Board meeting on January 15, 2008, Songy created a chart entitled "Statistical Summary of Options 1, 2, 2f and 3." The chart provided a summary of four alternate rezoning plans based on enrollment data provided by "demographics application specialist" Scott Duplechein ("Duplechein") using the

3

"Edulog"system.[5]  Specifically, the chart listed the current enrollment and percentage of African American students and "free and reduced lunch" students at each school in the District, then projected the enrollment and percentage of African American students and "free and reduced lunch" students at each school under each of the four rezoning options.  Songy made the chart available to the School Board members for consideration prior to the School Board meeting on January 15, 2008.

Songy's projections showed that, upon implementation of Option 2f, total student enrollment at East Ascension High School would increase from 1194 to 1566; total student enrollment at Dutchtown High School would decrease from 1670 to 1374; and total student enrollment at St. Amant High School would increase from 1585 to 1605. Songy's projections (based on actual 2008 enrollment numbers) also showed that Option 2f would result in an decrease of at-risk enrollment at East Ascension High School from 40% to 37%.[6]

On January 15, 2008, the School Board voted to adopt Option 2f.  Option 2f moved Duplessis Primary from the Dutchtown feeder zone to the East Ascension feeder zone, assigned two brand new primary schools to each of the high school feeder zones, and re-drew attendance zone lines such that a number of students from the Dutchtown

---

[5] According to Songy, Edulog was used to "geographically code all students actually enrolled in the school system based on their physical residential addresses and to project the statistical effects of various rezoning options."

[6] School Board member Troy Gautreau's ("Gautreau")  projections showed that, upon implementation of Option 2f, total student enrollment at East Ascension High School would increase from 1241 to 1427; total student enrollment at Dutchtown High School would increase from 1695 to 1768; and total student enrollment at St. Amant High School would increase from 1633 to 1726.  Gautreau's projections (based on 2007 enrollment numbers) also showed that Option 2f would result in a first year decrease of at-risk enrollment at East Ascension High School from 48% to 47%.

feeder zone and the St. Amant feeder zone were moved to the East Ascension feeder zone.

Louisiana Department of Education ("DOE") data shows that since the implementation of Option 2f, the Student Performance Scores ("SPS") at East Ascension High School have increased as follows: 2002 - 2003: 94.9; 2007 - 2008: 95.1; 2008 - 2009: 99.2; 2009 - 2010: 104.0; 2010 - 2011: 113.1.  As of school year 2011-2012, East Ascension High School earned an "A" rating from the DOE.

## B.    Lewis' Lawsuit

Shortly after the adoption of Option 2f, Plaintiff Darrin Kenny Lewis, Sr. ("Lewis"), the father of two African American schoolchildren assigned to East Ascension High School's feeder zone[7], filed this lawsuit against the School Board in Louisiana state court, pursuant to, *inter alia*, 42 U.S.C. § 1983[8] ("Section 1983") and the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1.  (Doc. 1-1.)  Lewis' First Amended Complaint alleged that the School Board's "actions since the construction of Dutchtown High School and in the adoption of Plan 2f were taken to ensure that East Ascension High School would maintain a disproportionately large non-white minority population, leaving the remaining two East Bank schools as predominantly white."  (Doc. 26, ¶ 13.)  He further alleged that,

---

[7] Lewis filed the lawsuit individually and on behalf of his children, Child "A" and Child "B."  As noted above, since the filing of the state court petition, "Child A" reached the lawful age of majority, and is now named as Plaintiff Oscar Varnado.

[8] The gravamen of Lewis' Section 1983 claim was that the School Board has subjected students in East Ascension High School to unequal educational opportunities, in violation of the Fourteenth Amendment to the United States Constitution.

because Option 2f placed a disproportionate number of at-risk[9] students in the East Ascension High School feeder zone, Option 2f "would ensure that the non-white minority students at East Ascension High School would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School." (Doc. 26, ¶ 15.) Lewis did not allege that at-risk students are a suspect class for equal protection purposes. Rather, he alleged that non-white students are being discriminated against based upon their race as a result of a disproportionate influx of at-risk students into East Ascension High School. (Doc. 26, ¶ 15.)

On April 3, 2008, the School Board removed Lewis' action to this Court and filed a motion to dismiss or for summary judgment. (Docs. 1, 36.) Lewis responded but did not cross-move for summary judgment. Subsequently, this Court adopted the Magistrate Judge's Report and Recommendation, granted the School Board's motion for summary judgment, and dismissed Lewis' claims. (Docs. 61, 66.) Lewis appealed the District Court's ruling, in part.

C.   **Lewis' Appeal**

On appeal, the Fifth Circuit, affirmed in part and reversed and remanded in part. Specifically, the Court held that "[b]ecause factual questions exist as to whether Option 2f had both a racially discriminatory motive and a disparate impact, and the court misapprehended the significance of the evidence before it, the court erred in

---

[9] "At-risk" students are those who are eligible for free or reduced-price lunch due to disadvantaged socioeconomic status. *Lewis*, 662 F.3d at 346, n. 7.

awarding summary judgment under a rational basis test ." *Lewis*, 662 F.3d at 352. The Fifth Circuit concluded that "[t]he standard of review, whether strict scrutiny or rational basis, turns on factual questions of discriminatory motive and impact" *Id.* and that "[f]urther factual development is required." *Id.* at 344.   The court further emphasized:

> No doubt the district had a responsibility to address overcrowding in Dutchtown High School.  It could not, however, do so by assigning individual students among the schools based upon disadvantaging one race over another in the assignment of at-risk students, even if the motive in doing so is the "benign" motive of "maintaining unitary status." The standard of review, whether strict scrutiny or rational basis, turns on the factual questions of discriminatory motive and impact.

*Id.* 352.

### D.    The Remaining Claim on Remand

In accordance with the Fifth Circuit's decision, the Court granted the parties additional time to conduct discovery on the following issues: (1) whether Option 2f employs a racial classification or is facially neutral; (2) whether the School Board acted with a discriminatory purpose when it adopted Option 2f; (3) whether Option 2f has discriminatory effect on non-white students.  (Doc. 104, p. 2.)  Subsequently, the parties engaged in additional discovery and filed the instant motions.

### E.    The Instant Cross-Motions for Summary Judgment

In support of his motion, Lewis argues that there is no genuine issue of material fact that Option 2f classifies students on the basis of race.  Therefore, the appropriate level of review is strict scrutiny.  Alternatively, Lewis argues that there is no genuine issue of material fact that Option 2f has a discriminatory impact on non-white students

7

at East Ascension High School and in its feeder system, and that the School Board acted with a discriminatory purpose when it adopted Option 2f. Therefore, the appropriate level of review is strict scrutiny review. According to Lewis, there is no genuine issue of material fact that Option 2f was not narrowly tailored to meet a compelling government interest. Therefore, Lewis is entitled to judgment as a matter of law.

In opposition, the School Board argues that Lewis has failed to point to sufficient evidence in the record to establish that Option 2f classifies students on the basis of race. The School Board further argues that Lewis has failed to point to sufficient evidence in the record to establish that Option 2f has a discriminatory impact on non-white students, and that the School Board acted with a discriminatory purpose when it adopted Option 2f. Accordingly, Lewis has failed to establish that the appropriate level of review is strict scrutiny, and his motion for summary judgment must be denied.

In support of its motion, the School Board argues that Lewis has failed to point to sufficient evidence in the record to establish that Varnado and Child B were injured by the School Board's adoption of Option 2f. Accordingly, Lewis lacks standing, and his remaining Equal Protection claim must be dismissed as a matter of law. Alternatively, the School Board argues that Varnado and Child B are similarly situated to the white students at East Ascension High School *only*, and that Lewis has failed to point to sufficient evidence in the record to establish that Varnado and Child B were treated differently than the white students at East Ascension High School. Thus, his remaining Equal Protection claim must be dismissed as a matter of law.

Alternatively, the School Board contends that there is no genuine issue of material fact that Option 2f is facially neutral. The School Board further argues that there is no genuine issue of material fact that Option 2f does not have a discriminatory impact on non-white students, and that the School Board did not act with a discriminatory purpose when it adopted Option 2f. Therefore, the appropriate level of review is rational basis. According to the School Board, there is no genuine issue of material fact that its adoption of Option 2f was rationally related to a legitimate governmental purpose. Accordingly, Lewis' remaining Equal Protection claim must be dismissed as a matter of law.

In opposition, Lewis fails to address the School Board's contention that he lacks standing. Lewis does contend, however, that Varnado and Child B are similarly situated to white students in the Dutchtown High School and St. Amant High School feeder zones. Lewis further argues that there is no genuine issue of material fact that Option 2f classifies students on the basis of race. Therefore, the appropriate level of review is strict scrutiny. Alternatively, that there is no genuine issue of material fact that Option 2f has a discriminatory impact on non-white students at East Ascension High School and in its feeder system, and that the School Board acted with a discriminatory purpose when it adopted Option 2f. Therefore, the appropriate level of review is strict scrutiny review. According to Lewis, there is no genuine issue of material fact that Option 2f was not narrowly tailored to meet a compelling government interest. Therefore, Lewis is entitled to judgment as a matter of law, and the School Board's motion for summary judgment must be denied.

## II.     Standard of Review

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether the movant is entitled to summary judgment, the court views facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997).

After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  If the moving party carries its burden of proof under Rule 56, the opposing party must direct the court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor. *Id.*  The court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992).  However, if the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor, the court must deny the motion for summary judgment. *International Shortstop, Inc.*, 939 F.2d at 1263.

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations,

unsubstantiated assertions, or a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

## III.   Analysis

### A.   Claims Raised at Summary Judgment

In support of its motion and memorandum in opposition, the School Board contends that this Court, and the Fifth Circuit, mischaracterized Lewis' remaining Equal Protection claim. *See Lewis*, 662 F.3d at 346; Doc. 104. Specifically, the School Board argues that the Lewis' claim is limited to whether Option 2f denies non-white students at East Ascension High School educational opportunities equal to those available to white students at the other two east bank high schools. Thus, the educational opportunities afforded to non-white middle and primary school students in the East Ascension High School feeder zone are not at issue, and should not be considered by the Court. Lewis failed to present any argument in opposition.

Lewis' First Amended Complaint alleged that Option 2f:

ensure[s] the non-white minority students at East Ascension High School would not, now and in the future be afforded educational opportunities

11

equal to those available to the students at either Dutchtown High School
or St. Amant High School.

(Doc. 26, ¶ 15).  For the first time in his memorandum in opposition to the School

Board's motion for summary judgment (and in his motion for summary judgment),

Lewis alleges that Option 2f denies non-white students at East Ascension High School

*and in its feeder zone* educational opportunities equal to those available to white

students at the other two east bank high schools *and in their feeder zones*.  (Docs. 107,

p. 8; 119, p. 2.)

Under Fifth Circuit precedent, when a claim is raised for the first time in

response to a summary judgment motion, the district court should construe that claim

as a motion to amend the complaint under Rule 15(a).  *Riley v. School Board Union

Parish*, 379 Fed. Appx. 335, (5th Cir. 2010) (citing cases).  Rule 15(a), which governs

the amendment of pleadings, provides that leave to amend pleadings "shall be freely

given when justice so requires."  Fed.R.Civ.P. 15(a)(2).  This, and other federal rules,

"reject the approach that pleading is a game of skill in which one misstep by counsel

may be decisive to the outcome and accept the principle that the purpose of pleading

is to facilitate a proper decision on the merits."  *Conley v. Gibson*, 355 U.S. 41, 48

(1957).  Thus, Rule 15(a) evinces a liberal amendment policy and a motion to amend

should not be denied absent a substantial reason to do so.  *See Jacobsen v. Osborne*,

133 F.3d 315, 318 (5th Cir. 1998).

However, leave to amend is by no means automatic.  Rather, it is within the

sound discretion of the trial court.  *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650

F.2d 663, 666 (5th Cir. 1981).  In exercising its discretion, the Court may consider such

factors as: (1) undue delay, bad faith, or dilatory motive on the part of the movant; (2) repeated failure to cure deficiencies by amendments previously allowed; (3) undue prejudice to the opposing party by virtue of allowance of the amendment; and (4) futility of the amendment. *Gregory v Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981).

The Fifth Circuit has cautioned that amendments should not be permitted where they would "fundamentally alter the nature of the case." *Waldron v. Adams & Reese, L.L.P.*, 676 F.3d 455 (5th Cir. 2012) (citing *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427-28 (5th Cir. 2004)); *see also Clarence Cargo v. Kan. City S.*, No. 05-2010, 2009 U.S. Dist. LEXIS 18927, at *8 (W.D. La. March 4, 2009) (in considering a motion for leave to amend the court must determine whether the proposed amendment: (1) merely proposed alternative legal theories for recovery on the same underlying facts; or (2) would fundamentally alter the nature of the case).

Here, Lewis seeks to broaden the scope of his remaining Equal Protection claim by alleging that Option 2f denies non-white students at East Ascension High School *and* non-white middle and primary school students in the East Ascension High School feeder zone educational opportunities equal to those available to white students at Dutchtown High School and St. Amant High School *and* white middle and primary school students in the Dutchtown High School and St. Amant High School feeder zones. The Court concludes, however, that this proposed amendment does not fundamentally alter the nature of the case.

Lewis' proposed amendment does not fundamentally alter any discriminatory impact analysis. Rather, Lewis' proposed amendment would require the fact-finder to

consider the impact of Option 2f on: (1) non-white students at East Ascension High

School; (2) non-white middle school students at Gonzales Middle and Central Middle;

and (3) non-white primary school students at Pecan Grove Primary, Gonzales Primary,

G.W. Carter Primary, Central Primary, and Duplessis Primary *instead of* the impact

on non-white students at East Ascension High School *only*. In other words, although

the fact-finder would be required to consider additional evidence related to more

schools and more students, such evidence would be based on the same underlying facts

and would not dramatically alter the subject matter of the lawsuit.

Further, the Court provided the School Board sufficient time to conduct

discovery related to Lewis' proposed amended claim. On May 6, 2013, the Court

granted the parties leave to conduct additional discovery on, *inter alia*:

> whether Option 2f places a disproportionate number of at risk students
> in East Ascension High School and in its feeder zone, and thus, denies
> non-white students at East Ascension High School and in its feeder zone
> educational opportunities equal to those available to white students at
> the other three east bank high schools, and their feeder zones . . . .

(Doc. 104, p. 2). The Court's order granted the parties until June 24, 2013 to conduct

this limited discovery. *Id.*

Additionally, the School Board has been on notice of Lewis' proposed amendment

since July 12, 2013, at the latest. At the conclusion of the limited discovery period,

Lewis filed his memorandum in opposition to the School Board's motion for summary

judgment (and his motion for summary judgment), in which he asserted the amended

claim. Lewis' broader claim was re-urged by counsel during the September 18, 2013

hearing on the motions. Despite receiving notice, the School Board failed to file a

memorandum in opposition to Lewis' attempt to amend his remaining Equal Protection claim. In sum, the Court concludes that the School Board would not be unduly prejudiced by the Court granting Lewis' motion for leave to amend his remaining Equal Protection claim.

Nothing in the record suggests undue delay, bad faith, or dilatory motive on the part of the Lewis, nor does the record indicate a repeated failure by Lewis to cure deficiencies by amendments previously allowed. Further, allowing Lewis' proposed amendment claim would not be futile.

Accordingly, the Court finds that all four factors weigh in favor of granting Lewis leave to amend his remaining Equal Protection claim. Therefore, the School Board's request that the Court limit Lewis' claim to the educational opportunities available to non-white students at East Ascension High School versus the educational opportunities available to white students at Dutchtown High School and St. Amant High School *only* is **DENIED**.

### B.   Standing

In support of its motion, the School Board argues that Lewis lacks standing to pursue his remaining Equal Protection claim. Specifically, the School Board contends that Lewis has failed to point to sufficient evidence to establish that Varnado and Child B were injured, or are likely to be injured, as a result of Option 2f. The School Board argues that Lewis has failed to identify an educational opportunity that was lost by his children as a result of Option 2f. According to the School Board, Varnado is no longer a resident in the East Ascension High School zone, and no longer a student at

East Ascension High School.  Further, Child B "is not enrolled in [East Ascension] and has not reached the grade level to be assigned to [East Ascension High School]."  Thus, according to the School Board, neither Varnado nor Child B were injured, or are likely to be injured, as a result of Option 2f.

The School Board also contends that Lewis has failed to point to sufficient evidence to establish that non-white students at East Ascension High School have been, or are likely to be, disparately impacted by Option 2f.  Accordingly, the School Board argues that Lewis lacks standing and his remaining Equal Protection claim must be dismissed.  Lewis failed to present any argument in opposition.

Every party that comes before a federal court must establish that it has standing to pursue its claims.  The doctrine of standing asks "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).  The Supreme Court has described standing as "contain[ing] two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Id.* (citing *Elk Grove Unified Sch. Dist.*, 542 at 11 (citations and internal quotation marks omitted)).

Article III standing requires a plaintiff to show: "(1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th

Cir. 2001) (citations omitted).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Article III standing to bring an equal protection challenge is not without limits.  The rule that a plaintiff must assert a particularized injury, rather than a generalized grievance, "applies with as much force in the equal protection context as in any other." *United States v. Hays*, 515 U.S. 737, 743 (1995).  Even if the government has discriminated on the basis of race, only those who are "personally denied" equal treatment have a cognizable injury under Article III.  *Allen v. Wright*, 468 U.S. 737, 755 (1984) (internal quotation omitted).

A plaintiff's standing to bring a cause of action is assessed at the time the suit was filed.  *Davis v. FEC*, 554 U.S. 724, 734 (2008); *Defenders of Wildlife*, 504 U.S. at 571 n.4.  Thus, events that occur subsequent to the filing of a complaint will not prevent a plaintiff from establishing standing which existed at the time of the pleadings.  *See Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 (2000) (comparing standing with the doctrine of mootness, which is affected by subsequent events).

Here, the School Board does not challenge Lewis' ability to demonstrate the traceability or redressability elements of the constitutional standing doctrine. Thus, the sole inquiry is whether Varnado and Child B actually suffered or will imminently suffer an injury in fact as a result of the School Board's adoption of Option 2f.

"[O]ne form of inquiry under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved*, 551 U.S. at 719. Here, Lewis asserts injury to Varnado and Child B by alleging that the School Board adopted a race-based redistricting plan. Specifically, Lewis alleges that the School Board used racial classifications in determining where to draw the District's lines, thereby treating the non-white students differently on account of race.

Further, at the time the original state court petition was removed to this Court, Varnado was enrolled in the eighth grade at a school in the East Ascension High School feeder zone, and Child B was enrolled in the third grade at a school in the East Ascension High School feeder zone. (Docs. 1-2, ¶ 17; 97, ¶ 4.) Accordingly, at the time the original state court petition was removed to this Court, Varnado and Child B both lived and attended schools in the East Ascension High School feeder zone.[10] Thus, the Court concludes that Lewis' allegations of injury are neither conjectural nor

---

[10] Indeed, the record shows, and the School Board concedes, that Varnado attended East Ascension High School for at least one year.

hypothetical, and thus, sufficient to confer standing.[11]  Accordingly, the School Board's request that the Court dismiss Lewis' claim on this basis is **DENIED**.

    **C.**    **42 U.S.C. § 1983**

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' . . . [T]his provision [also] safeguards certain rights conferred by federal statutes." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).  Here, the gravamen of Lewis' Section 1983 claim is that the School Board has denied non-white students in the East Ascension High School feeder zone equal educational opportunities, in violation of the Fourteenth Amendment, by adopting a school rezoning plan that "feeds" a disproportionate number of at-risk students into the East Ascension High School feeder zone.

    **1.**    **Equal Protection Clause**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The central purpose of the Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).  Indeed, "[d]istinctions between citizens solely because of their ancestry are by

---

[11] In the alternative, the Court finds that Lewis allegations of injury due to the alleged inferior educational opportunities available non-white students in the East Ascension High School feeder zone, and the evidence he points to in support thereof (e.g., the increasing performance gap between East Ascension High School and the other two east bank high schools), are sufficient to confer standing.

their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tx. at Austin*, 133 S. Ct. 2411, 2418, 186 l. Ed. 2d 474, 485 (2013) (internal quotations and citations omitted). "[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications . . . be subjected to the most rigid scrutiny." *Id.* at 2418-19, 485 (internal quotations and citations omitted).

### i.  Strict Scrutiny Review - Racial Classification

"It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720; *see also Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). This is because a "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (citations omitted).

Here, Lewis argues that Option 2f classifies students on the basis of race. His argument relies on the Supreme Court's opinion in *Fisher*. According to Lewis, *Fisher* is applicable here because the School Board used racial classifications in determining where to draw the new school zones, thereby treating non-white students differently on account of their race. Lewis also contends that the School Board's purported "good faith" consideration of race is entitled to little to no weight. Accordingly, Option 2f must be reviewed under strict scrutiny.

In *Fisher*, the Supreme Court considered the University of Texas at Austin's explicit consideration of race in its undergraduate admissions process. Because the university classified admissions applicants on the basis of race, the Court began "from the position that 'any official action that treats a person differently on account of his race or ethnic origin is inherently suspect.'" *Fisher*, 133 S. Ct. at 2419, 186 L. Ed. 2d at 486. The Court also held that the Fifth Circuit "confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications and affirming the grant of summary judgment on that basis." *Id.*, 133 S. Ct. at 2421, 186 L. Ed. 2d at 488. *Fisher*, however, is factually distinguishable from the case at bar.

Unlike the University of Texas at Austin's admissions process, Option 2f does not include a explicit racial classification. Indeed, Lewis has failed to point to any provision of Option 2f that classifies students on the basis of race, or any provision that uses race as a factor in a student's school assignment. Instead, Lewis points to the School Board's consideration of racial and socioeconomic demographic data, including Songy's "Statistical Analysis of Options 1, 2, 2f, and 3" chart, prior to voting to adopt Option 2f. According to Lewis, the Board relied on and integrated this data into Option 2f "to ensure that the [East Ascension High School] feeder system would continue to house a disproportionate allocation of at-risk students." (Doc. 119, pp. 2-3.)

In opposition, the School Board concedes that the School Board members who voted for Option 2f considered the projected enrollment and percentage of African American and "free and reduced lunch" students at each school under each proposed

rezoning plan prior to voting.  The School Board further concedes that Duplechein prepared multiple demographic data reports for review by School Board members, who were concerned about the District maintaining its unitary status.  The School Board argues, however, that Lewis has failed to point to any evidence in the record to establish that such data was incorporated into the provisions of Option 2f.  According to the School Board, its consideration of racial and socioeconomic demographic data was solely for the purpose of ensuring the District maintained unitary status,[12] and does not amount to a rezoning plan that classifies students on the basis of race.

In a factually analogous case, the United States Court of Appeals for the Sixth Circuit considered whether the Nashville Board of Public Education's rezoning plan segregated students on the basis of race, in violation of the Equal Protection Clause. *Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 436, 187 L. Ed. 2d 283 (2013).  The Court concluded that the plaintiffs' inability to cite to a provision of the rezoning plan that classifies students on the basis of race or uses race as a factor in school assignment was fatal to their claim that the plan employed a racial classification:

> The plaintiffs have been unable to cite to any provision of the Rezoning Plan that classifies students by race or that uses race as a factor in school assignment because there is no such provision.  Instead, the Plan classifies students on the basis of geography.  The only factor that

---

[12] While the testimony of the School Board members is that they only considered racial and socioeconomic data to ensure the District maintained its unitary status, the Supreme Court has made clear that a school district's use of "benign racial classifications" does not preclude the Court from finding that the district acted with *discriminatory intent*.  *Parents Involved*, 551 U.S. at 758-59 (emphasis added).  At issue here, however, is whether Option 2f employs a racial classification.  For the reasons set out below, the Court concludes that the mere consideration of projected racial and socioeconomic data does not amount to a racial classification.

determines a student's school choices is his or her place of residence, regardless of race. And there is no provision of the Plan that requires a specific "balance" of racial groups in each school or each cluster. So the answer to the question of whether the Plan classifies students by race is a clear "no."

*Spurlock*, 716 F.3d at 394. The court further rejected the plaintiffs' argument that

Nashville's rezoning plan employed a racial classification because its drafters made use

of detailed racial and ethnic data throughout the process of development:

The plaintiffs point out that the Task Force obtained data on the racial breakdown of students attending different schools under the old student-assignment plan, as well as projections of student enrollment by race in the event that various modifications were adopted. They contend that obtaining this data and including some of it in the Rezoning Plan shows that the Plan classifies students by race.

We find the plaintiffs' argument unpersuasive. Racial classification requires more than the consideration of racial data. If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions. The import of the plaintiffs' argument, in other words, is to impose a duty of ignorance on the part of public officials. Such a requirement would be counterproductive. It would also be impossible to enforce because there is no practical way to monitor and supervise the data that policymakers are permitted to *consider*.

*Id.* at 394 (emphasis in original).

Similarly here, Lewis has to failed to point to any provision of Option 2f that

classifies students by race, or uses race as a factor in school assignment. Rather, a

review of Option 2f indicates that it classifies students on the basis of geography, like

in *Spurlock*. Further, the School Board's consideration of the projected enrollment and

percentage of African American and "free and reduced lunch" students does not amount

to a rezoning plan that assigns students on the basis of race. *Parents Involved*, 551

U.S. at 745 (the prohibition against racial classifications "ha[s] nothing to do" with the use of racial demographic data in policymaking, so long as the policy itself does not classify people on the basis of race).

In another factually analogous case, the United States Court of Appeals for the Third Circuit considered whether the school redistricting plan in Lower Merion, Pennsylvania discriminated against non-white students on the basis of race, in violation of the Equal Protection Clause. *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 529 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2773, 183 L. Ed. 2d 639 (2012).  First, however, the Court was required to determine whether strict scrutiny applied.  *Id.* at 545.  Like the rezoning plan at issue here, the redistricting plan in *Lower Merion* was "facially neutral, assigning students to schools based only on the geographical areas in which they live."  *Id.*  The Third Circuit further noted that "the Plan, on its face, neither uses racial classification as a factor in student assignment nor distributes any burdens or benefits on the basis of racial classification."  *Id.*  Nevertheless, the plaintiffs attempted to analogize the redistricting plan to policies that were invalidated by the Supreme Court because they employed an explicit racial classification.  The Third Circuit rejected this argument:

> Appellants also conflate a school assignment policy that explicitly classifies based on race with the consideration or awareness of neighborhood racial demographics during the development and selection of a policy. . . . The consideration or awareness of race while developing or selecting a policy, however, is not in and of itself a racial classification. Thus, a decision [ ] maker's awareness or consideration of race is not racial classification.  Designing a policy 'with racial factors in mind' does not constitute a racial classification if the policy is facially neutral and is administered in a race-neutral fashion.

*Id.* at 548. Accordingly, the Third Circuit held that strict scrutiny was not appropriate on this basis. *Id.*

Similarly, here Lewis argues that in considering racial and socioeconomic data prior to voting, members of the School Board "incorporated" racial classifications into Option 2f. However, Lewis conflates the consideration or awareness of race with racial classifications. The School Board's mere awareness or consideration of the projected enrollment and percentage of African American and "free and reduced lunch" students does not equate to a rezoning plan that classifies students on the basis of race. As noted above, the Supreme Court's plurality opinion in *Parents Involved* acknowledged that demographic data is used in a variety of legislative and policymaking contexts, and made clear that the use of such data, without more, does not offend the Constitution. *Parents Involved*, 551 U.S. at 745.

Further, this Court's conclusion is consistent with the Supreme Court's opinion in *Parents Involved*. In *Parents Involved*, the Court considered whether a public school may choose to classify students by race and rely upon that classification in making school assignments. *Id.*, 551 U.S. at 711. There, two school districts adopted student assignment plans that relied on race to determine which public schools certain children would attend. *Id.* at 710. Specifically, the school districts used an individual student's race as a "tiebreaker," or as justification for denying the student's assignment application or transfer request if the student's race would contribute to the school's racial imbalance. *Id.* at 710, 716-17. The Court noted that the school districts' school assignment plans were directed at racial balance *only*:

> In design and operation, the plans are directed only to racial balance, pure and simple, an objective this Court has repeatedly condemned as illegitimate.

*Id.* at 726. Accordingly, the Court held that the school districts' use of individual racial classifications accorded differential treatment on the basis of race, and thus, were unconstitutional.

The case at bar implicates different considerations than the explicit racial classifications at issue in *Parents Involved*. *Id.* at 745 (making clear that the plans at issue used "explicit racial classifications" and that "other means for achieving racial diversity in schools . . . implicate different considerations."). Here, it is uncontested that the District undertook to develop a rezoning plan to address substantial population growth in the Dutchtown area of East Ascension Parish. Further, Lewis does not allege that the provisions of Option 2f include explicit racial classifications. As noted above, Lewis has failed to point to any provision of Option 2f that classifies students on the basis of race, or any provision that uses race as a factor in a student's school assignment. Classifying African American and "free and reduced lunch" students for the purpose of assessing the impact of the proposed rezoning plans on demographics is different from actually assigning individual students to a particular school on the basis of their race.

In sum, the Court concludes that the School Board's consideration of projected racial and socioeconomic data prior to voting does not amount to a racial classification. Accordingly, Lewis' request that the Court review Option 2f under strict scrutiny on this basis is **DENIED**. The School Board's request that the Court dismiss Lewis' claim

that Option 2f employs a racial classification is **GRANTED**.

### ii.     Strict Scrutiny Review - Racial Neutral[13]

Strict scrutiny also applies where the government action is race-neutral on its face, but has a discriminatory purpose and discriminatory impact. *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977).  If the School Board is found to have acted with a discriminatory purpose, and Option 2f is found to have a discriminatory impact, strict scrutiny places the burden on the School Board to prove that its actions were narrowly tailored to achieve a compelling government interest. *Parents Involved*, 551 U.S. at 720; *Gratz*, 539 U.S. at 270.

### a.     Discriminatory Impact

Although disproportionate impact alone is not dispositive, a plaintiff must show discriminatory impact in order to prove an equal protection violation.  This is so because, "[t]o succeed on his equal protection claim, [plaintiff] must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated." *Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir.1992) (citing *McCleskey v. Kemp*, 481 U.S. 279 (1987)).

### 1.     Similarly Situated Requirement

In support of its motion, the School Board argues that Lewis' remaining Equal Protection claim must be dismissed because Lewis cannot establish that Varnado and

---

[13] Strict scrutiny also applies where a facially neutral law or policy is applied differently on the basis of race. *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). Here, however, Lewis does not allege that Option 2f was applied differently to students on the basis of race. Accordingly, analysis of this alternative is not necessary.

Child B were treated differently than similarly situated students of a different race. The School Board contends that Lewis' has failed to establish that Varnado and Child B are similarly situated to white students in the Dutchtown High School and St. Amant High School feeder zones. Thus, the Court must find that Varnado and Child B are similarly situated to white students at East Ascension High School. The School Board argues that because Lewis has failed to point to sufficient evidence to establish that Varnado and Child B were treated differently than white students at East Ascension High School, his remaining Equal Protection claim must be dismissed.

In opposition, Lewis contends that non-white students make up the majority at East Ascension High School *and* that a majority of the non-white students in the District are in the East Ascension High School feeder zone. Accordingly, Lewis argues that the similarly situated students to whom non-white students in the East Ascension High School feeder zone should be compared are *not* white students at East Ascension High School, but rather, white students in the Dutchtown High School and St. Amant High School feeder zones. Lewis argues that the white students in the Dutchtown High School and St. Amant High School feeder zones make up seventy-seven percent of the total white student population on the east bank. Lewis contends that the percentage of white students in these feeder zones is increasing, and that these students have benefitted from the disproportionate funneling of at-risk students into the East Ascension High School feeder zone. Thus, non-white students in the East Ascension High School feeder zone who have been burdened by Option 2f are more appropriately compared to white students in the Dutchtown High School and St.

Amant High School feeder zones who have benefitted from it.

To state an Equal Protection claim, a plaintiff must show that a "challenged government action classifies or distinguishes between two or more relevant groups." *Cornerstone Christian Schools v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009) (quoting *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (internal quotations omitted). "The concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). The Fifth Circuit has made clear that the "similarly situated" inquiry is case-specific, depends "substantially on the facts and context of the case," and requires the court to consider "the full variety of factors that an objectively reasonable . . . decisionmaker would have found relevant in making the challenged decision." *Lindquist v. City of Pasadena*, 669 F.3d 225, 233-34 (5th Cir. 2012).

Here, the School Board also does not contest that the *majority* of the non-white students in the District are in the East Ascension High School feeder zone *and* that the *majority* of the white students in the District are in the Dutchtown High School and St. Amant High School feeder zones. With regard to the factors considered by the School Board when it adopted Option 2f, the School Board does not contest that its members considered race and socioeconomic status when they developed, evaluated, and adopted Option 2f. Unlike the students in *Lower Merion*, non-white and white students in the District have each been affected by Option 2f (i.e. assigned to different schools). Indeed, the School Board does not contest this fact. Further, the School

29

Board does not contest that Option 2f assigns all students to schools based on their geographic location.

Unlike the court in *Lower Merion*, this Court is unable to consider all of the evidence presented until after a full trial on the merits. *See Lower Merion*, 665 F.3d at 542. However, given the evidence presented here, context of this matter, and factors considered by the School Board when it adopted Option 2f, the Court concludes that Varando and Child B are, in fact, similarly situated to white students in the Dutchtown High School and St. Amant High School feeder zones. Accordingly, the School Board's request that the Court dismiss Lewis' remaining Equal Protection claim on this basis is **DENIED**.

## 2.      Evidence of Discriminatory Impact

In support of his allegation that Option 2f has a discriminatory impact on non-white students in the East Ascension High School feeder zone, Lewis points to the increase in at-risk students in the feeder zone. According to Lewis, only twenty-nine percent of the total East Bank student population is assigned to the East Ascension High School feeder zone. Yet, since the implementation of Option 2f, the percentage of at-risk students in the feeder zone has increased from forty to forty-seven percent. Lewis further contends that the percentage of at-risk students in the Dutchtown High School feeder zone has decreased from twenty-seven to twenty-five percent; and the percentage of at-risk students in the St. Amant High School feeder zone has remained at thirty-two percent. According to Lewis, this disproportionate allocation of at-risk students into the East Ascension High School feeder zone invariably impacts the

educational opportunities afforded to non-white students in that feeder zone. In support of this argument, Lewis points to the increasing performance gap between students at East Ascension High School versus Dutchtown High School and St. Amant High School, particularly ACT scores and SPS. Lewis further contends that the School Board has mischaracterized the enrollment and student performance data used in support of its motion and memorandum in opposition.

In opposition, the School Board argues that the year it initially implemented Option 2f, the percentage of at-risk students increased at all three high schools.[14] It further points to statistical data showing that, since the implementation of Option 2f, the percentage of at-risk students has increased at all three high schools. Specifically, that the percentage of at-risk students at East Ascension High School has increased by 6.9 percent; that the percentage of at-risk students at Dutchtown High School has increased by 5.2 percent; and that the percentage of at-risk students at St. Amant High School has increased by 8.6 percent. The School Board also points to each high school's performance reports, which show that the SPS for students at East Ascension High School have increased since Option 2f was implemented.

After reviewing the evidence presented, the Court concludes that the parties have presented a triable issue of fact. Further, given the volume of data and the various levels at which it can be evaluated (i.e. by feeder system, school level, individual school), the Court declines to enter summary judgment for either party on

---

[14] The School Board also argues that this Court should reject the evidence presented by Lewis' expert, Percy Bates. Bates ability to serve as an expert in this case is the subject of a motion pending before this Court. (Doc. 125.) Accordingly, the evidence presented by Bates shall not be considered at this time.

the question of discriminatory impact (i.e. whether Option 2f results in inferior educational opportunities for non-white students in the East Ascension High School feeder zone). At trial, witnesses for both sides will be permitted to present evidence on the significance of the data in evaluating the alleged discriminatory impact. Accordingly, both parties' request that the Court grant summary judgment on this issue is **DENIED**.

### b.    Discriminatory Intent or Purpose

The Supreme Court has made clear that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Arlington Heights*, 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 239-40). Discriminatory intent or purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,'" the action's beneficial or adverse effects "upon an identifiable group." *Feeney*, 442 U.S. at 279. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified" and courts must apply strict scrutiny. *Id.* at 266-67. However, "absent a racially discriminatory purpose, explicit or inferable, on the part of the [decisionmaker], the statutory distinction is subject only to rational basis review." *Feeney*, 442 U.S. at 272.

In analyzing the issue of discriminatory intent, the Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), is instructive. In *Arlington Heights*, the Court reaffirmed that "official action will not be held unconstitutional solely because it results in a racially disproportionate

impact," and that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at 264-65. The court's determination requires a "sensitive inquiry" into the available "circumstantial and direct evidence of intent" including: (1) whether the official action has a racially disproportionate impact; (2) the historical background of the decision; (3) the sequence of events leading up to the decision; (4) departures from the normal procedure; (5) departures in the substantive factors usually considered; and (6) the legislative or administrative history. *Arlington Heights*, 429 U.S. at 267-68. These factors are not exhaustive, *id.* at 268, and evidence "must necessarily usually rely on objective factors," *Fenney*, 442 U.S. at 278, n.24.

In support of his motion and memorandum in opposition, Lewis argues that Option 2f has had a discriminatory impact on non-white students in the East Ascension High School feeder zone. Lewis further contends that there is no plausible neutral explanation for the discriminatory impact. Thus, the impact itself signals that the School Board adopted Option 2f with a discriminatory intent. *See Feeney*, at 275 (if discriminatory impact cannot be "plausibly explained on neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral") (citation omitted). Lewis further argues that population growth in the Dutchtown area of East Ascension Parish is mere pretext for the School Board's discriminatory conduct. Lewis contends that this Court look no further than the School Board members' depositions to conclude that racial demographics were the primary, if not only, consideration by the School Board with it drew the rezoning lines.

In support of his argument, Lewis points to the following evidence of discriminatory intent. Regarding the discriminatory impact factor, Lewis points to statistical evidence of the increase in at-risk student enrollment in the East Ascension High School feeder zone, as compared to the decrease in at-risk student enrollment in at least one of the other two zones. Lewis also points to the performance gaps between students at East Ascension High School and students at Dutchtown High School and St. Amant High School, particularly lower ACT and SPS scores. However, as concluded above, a genuine issue of material fact exists as to whether Option 2f has had a discriminatory impact on students in the East Ascension High School feeder zone. Accordingly, this factor is not dispositive.

Regarding the historical background factor, Lewis points to Gautreau's deposition in which he testified that the School Board members were "aware of the current at-risk populations that exist in the Gonzales area school and they know they're high." (Doc. 107-1, p. 70.) Lewis also points to a School Board PowerPoint presentation entitled, "East Side Re-District Impact" that details, *inter alia*, the increasing percentage of at-risk students at each of the schools in the District, and the impact on student performance. Lewis further points to a School Board PowerPoint presentation entitled, "Proposed Districting Options" that details the "Duplessis Feeder Option" and the "Prairieville Feeder Option," as well as the projected percentage of African American and at-risk students at each school under each option. According to Lewis, such evidence establishes that "[t]he School Board disregarded the growing problems within the East Ascension feeder system, of which they were cognizant, by

34

the adoption of Option 2f." (Doc. 107, p. 27.)

Regarding the legislative or administrative history factor, Lewis points to Gautreau's PowerPoint presentation, as well as the charts prepared by him and Songy. According to Lewis these presentations and charts support the conclusion that the "primary intent of the School Board was to redraw the lines, distributing the desired populations where they wanted them, with a keen focus on the racial and socioeconomic demographics." (Doc. 107, p. 27.)

Lewis also points to the deposition testimony of multiple School Board members, which, according to Lewis, establishes that the School Board relied on the race and socioeconomic status of the students residing in various geographic locations when it developed and evaluated the rezoning options. Specifically, Lewis points to the deposition testimony of Songy, who testified that the School Board "had to make sure that in [rezoning the District], we did not, by this move, increase the minority, the black percentage at East Ascension High School. So we had to check and make sure that that didn't happen." (Doc. 107-2, p. 35.) Lewis further points to the deposition testimony of School Board member Jody Elisar ("Elisar"), who testified about his conversation with Gautreau regarding the number of non-white and at-risk students in various geographical locations, and drawing the rezoning lines in such a way as "to make sure the numbers look better." (Doc. 107-2, p. 47.) Lewis also points to the deposition testimony of School Board member Catherine Davis ("Davis"), who testified that each of proposed plans labeled the students as white or non-white and as at-risk or non-at-risk. (Doc. 107-2, 59.) Finally, Lewis points to the deposition testimony of

School Board member Harold Jarreau ("Jarreau"), who testified that the School Board considered the "numbers" of white versus non-white students.  According to Lewis, Jarreau's testimony also establishes that the School Board was aware of the adverse effect of "feeding" a disproportionate number of at-risk students into the East Ascension High School feeder zone:

> Q:   Do you have an opinion, as to generally, when you look at the free and reduced population, how they perform in schools?
>
> A:   The lower income, I mean, it's a fact that lower income, what the Federal Government would say is that there are - they're in the lower performing, that they are lower performing.
>
> Q:   They are lower performers generally?
>
> A:   General.
>
> . . .
>
> Q:   Okay.  And if you were bringing in more lower economic kids, what is the significance of that?
>
> A:   The significance of that is if you brought in more than too high a number, then they say you could impact the learning, the school performance score.
>
> Q:   So you are aware of that, you have seen information that says that?
>
> A:   Yeah, I've seen information that says that and I can go back to where my beliefs are is that that's another measurement to look at that you don't ignore.

(Doc. 107-2, pp. 67-69.)

In support of its motion and in opposition to Lewis' motion, the School Board argues that Lewis cannot establish discriminatory purpose, as a matter of law. According to the School Board, Option 2f has not had a discriminatory impact on non-

white students in the East Ascension High School. The School Board also argues that a discriminatory intent cannot be inferred from its consideration of the demographic projections, as the demographic data available to it at the time it voted showed that Option 2f would reduce the percentage of at-risk students at East Ascension High School. The School Board further contends that Lewis has failed to point to sufficient evidence to show that members voted for Option 2f because of the alleged adverse impact on non-white students. Rather, the School Board argues that its consideration of racial and socioeconomic data was for the sole purpose of ensuring the District maintained its unitary status. The School Board further contends that it adopted Option 2f, rather than other plans, because it: (1) addressed the overcrowding problem in Dutchtown; (2) would result in a better equalization of the total school populations among the high schools, and (3) would move the least amount of students.

In support of its opposition and motion for summary judgment, the School Board points to the deposition testimony of Elisar, who testified that the purpose of adopting a new rezoning plan was to eliminate the growth in the Dutchtown area of Ascension Parish. (Doc. 113, pp. 3-4.) The School Board also points to the deposition testimony of Davis, who testified that she voted for Option 2f, despite the increase in non-white and at-risk students, because it resulted in students being moved fewer times. (Doc. 113-1, pp. 10-11.)[15]   The School Board also points to the deposition testimony of

---

[15] In its memorandum in support of its motion for summary judgment, the School Board appears to suggest that because two African American members of the School Board voted for or supported Option 2f, the School Board could not have acted with discriminatory intent. *See, e.g.*, Doc. 117, p. 31. The Court rejects, however, any suggestion that discrimination cannot occur between persons of the same race or ethnicity. Thus, the School Board's argument is unavailing.

Jarreau, who testified that it was important to consider "racial ratios" "to be as fair as you can when you make the moves," and that his goal in voting for Option 2f was to "balance the three schools" in total population. (Doc. 115, pp. 5-6.) The School Board further points to the deposition testimony of School Board member Taft Kleinpeter, who testified that his vote for Option 2f was strictly based on the gross number of the students at the various schools. (Doc. 112-3, p. 28.) According to the School Board these race-neutral reasons eliminate any inference of discriminatory intent.

Evaluating the evidence presented by both parties against the *Arlington Heights* factors, the Court concludes that there are genuine issues of material fact as to whether the School Board acted with a discriminatory purpose. Unlike *Lower Merion*, Lewis has pointed to sufficient evidence to "spark[ ] the suspicion of discriminatory intent," and thus, presented adequate evidence to survive summary judgment. *Lower Merion*, 665 F.3d at 553. However, given the evidence presented, the Court finds that a reasonable jury, drawing all inferences in favor of the School Board, could also arrive at a verdict in the School Board's favor.

In sum, the Court concludes that neither party has established that he/it is entitled to judgment as a matter of law. Rather, the parties have presented adequate evidence to create a triable question of fact on discriminatory intent. Accordingly, both parties' request that the Court grant summary judgment on this issue is **DENIED**.

### iii.    Rational Basis Review

The Court concludes that a trial on the merits is necessary to determine the degree of correlation between the School Board's intent and the result achieved,

thereby precluding summary judgment on the issue of whether strict scrutiny must be applied. Accordingly, the Court shall decline to evaluate the School Board's actions under rational basis review.

## VI.   Conclusion

Accordingly,

**IT IS ORDERED** that Plaintiff Darrin Kenny Lewis, Sr. **Motion for Summary Judgment (Doc. 107)** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Ascension Parish School Board's **Motion for Summary Judgment (Doc. 108)** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that a **FINAL PRETRIAL CONFERENCE** shall be held on <u>February 13, 2014 at 2:00 p.m.</u> in Chambers.

Baton Rouge, Louisiana, this 11th day of February, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**