# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARRIN KENNY LEWIS, SR.** | **CIVIL ACTION** |
| **VERSUS** | |
| **ASCENSION PARISH SCHOOL BOARD** | **NO.: 08-00193-BAJ-RLB** |

## RULING AND ORDER

## I.     INTRODUCTION

This matter involves school redistricting in Ascension Parish, State of Louisiana and allegations that the school attendance rezoning plan violates the Equal Protection Clause of the Fourteenth Amendment.

On February 18, 2014, this matter came before the Court for a non-jury trial on the merits.  (Docs. 195, 196.)  Having considered the parties pretrial and post-trial submissions, the evidence introduced at the trial, and the arguments presented by counsel, the Court finds that Plaintiff Darrin Kenny Lewis, Sr. ("Lewis") has failed to prove by a preponderance of the evidence that Option 2f[1] violates the Equal Protection Clause of the Fourteenth Amendment.  Accordingly, Lewis's request for a judgment in his favor, injunctive and declaratory relief, punitive damages, and attorneys' fees and

---

[1] In January 2008, the Ascension Parish School Board adopted a new school attendance rezoning plan (i.e., Option 2f).  Option 2f was one of several school attendance rezoning plans considered by the School Board, and one of two plans voted on by the School Board in January 2008.  The issues at trial focused on the constitutionality of Option 2f.

costs is **DENIED**. The Court's findings of fact and conclusions of law are set forth

below, as required by Federal Rule of Civil Procedure ("Rule") 52(a).

## II.    JURISDICTION

It is uncontested that this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   BACKGROUND

### A.    The Ascension Parish School Board's Adoption of Option 2f

The Ascension Parish School District (the "District") is a political subdivision of

the State of Louisiana, governed by the Ascension Parish School Board (the "School

Board"). The District operates four high schools in Southeast Louisiana:

Donaldsonville High School[2] on the west bank of the Mississippi River, and East

Ascension High School, Dutchtown High School, and St. Amant High School on the

east bank of the Mississippi River. The District currently operates fourteen primary

schools[3] and seven middle schools[4] on the east bank of the Mississippi River.[5] The

District assigns students to these schools through an attendance-zone-based "feeder

---

[2] Option 2f affected the schools on the east bank of the Mississippi River only. Thus, the schools on the west bank, including Donaldsonville High School, Lowery Intermediate, Lowery Elementary, and Donaldsonville Elementary are not at issue.

[3] Primary Schools: (1) Central; (2) Duplessis; (3) Dutchtown; (4) G.W. Carver; (5) Galvez; (6) Gonzales; (7) Lake; (8) Lakeside; (9) Oak Grove; (10) Pecan Grove; (11) Prairieville; (12) Sorrento; (13) Spanish Lake; and (14) St. Amant. Lake Elementary School is classified by the District as both a primary and middle school.

[4] Middle Schools: (1) Central; (2) Dutchtown; (3) Galvez; (4) Gonzales; (5) Lake Elementary; (6) Prairieville; and (7) St. Amant. Lake Elementary School is classified by the District as both a primary and middle school.

[5] At the time of the adoption of Option 2f, the District operated nine primary schools: (1) Central; (2) Duplessis; (3) Dutchtown; (4) G.W. Carver; (5) Galvez; (6) Gonzales; (7) Lake; (8) Oak Grove; and (9) St. Amant; and six middle schools: (1) Dutchtown; (2) Galvez; (3) Gonzales; (4) Lake; (5) Prairieville; and (6) St. Amant.

plan," whereby specified elementary schools "feed" into specified middle schools, which in turn "feed" into one of the high schools.

In 2004, this Court declared the District unitary[6] and dismissed a longstanding desegregation case against the District.[7] *See Charles v. Ascension Parish Sch. Bd.*, Civil Action No. 65-3257-JVP (M.D. La.). In 2008, the eleven-member elected School Board regained the ability to assign students to schools in the District, pursuant to its authority under Louisiana Revised Statute § 17:81.

In the early 2000's, Ascension Parish began experiencing significant population growth in the Dutchtown area of the Parish. In 2002, the School Board opened Dutchtown High School to address student population growth. However, by 2006, the enrollment at Dutchtown Middle School, a Dutchtown High School feeder school, had risen to more than 1,000 students.

In December 2004, the School Board established a "Growth Impact Committee" to develop a plan to address the student population growth in the Dutchtown area of East Ascension Parish. According to Superintendent Donald Songy[8] ("Songy"), the District's goal was to move approximately 450 students from Dutchtown Middle School,

---

[6] Unitary status means that a school district has abandoned the "dual" status of "intentional segregation of students by race" and "has been brought into compliance with the command of the Constitution." *Freeman v. Pitts*, 503 U.S. 467, 487 (1992) (internal quotation marks omitted). It signifies, in other words, that a district has "eliminated the vestiges of prior segregation to the greatest extent practicable" with respect to legally imposed segregation, although it does not mean that, as a factual matter, all district schools contain a racially diverse mix of students. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 701, 715-16, 720-21 (2007).

[7] The Court, however, retained supervision over District operations through the 2006-2007 school year.

[8] Songy was the District's Superintendent, beginning in 2006. His successor, Patrice Pujol, Ed.D. ("Dr. Pujol"), began her tenure in 2010, and is the current Superintendent.

and thus, out of Dutchtown High School's attendance zone, to other east bank schools with capacity for growth.

On January 15, 2008, the School Board adopted school attendance rezoning plan 2f ("Option 2f"). Option 2f re-drew the school attendance zone lines so that approximately 339 students from the Dutchtown attendance zone and the St. Amant High School attendance zone were moved to the East Ascension High School attendance zone as of the 2008-2009 school year. Option 2f also moved Duplessis Primary School from the Dutchtown High School attendance zone to the East Ascension High School attendance zone, assigned one new middle school to the East Ascension High School attendance zone, assigned two new primary schools to the Dutchtown High School attendance zone, assigned one new primary school to the East Ascension High School attendance zone, and assigned three new primary schools to the St. Amant High School attendance zone.

### B.     Plaintiff Darrin Kenny Lewis, Sr.'s Lawsuit

Shortly after the School Board's adoption of Option 2f, Lewis, the father of two African American schoolchildren assigned to the East Ascension High School attendance zone[9], filed this lawsuit against the School Board, pursuant to, *inter alia*, 42 U.S.C. § 1983[10] ("Section 1983") and the Fourteenth Amendment to the United

---

[9] Lewis filed the lawsuit individually and on behalf of his children, Child "A" and Child "B." Since the filing of the state court petition, "Child A" reached the lawful age of majority, and is now named as Plaintiff Oscar Varnado ("Varnado").

[10] The gravamen of Lewis's Section 1983 claim is that the School Board subjected nonwhite students in the East Ascension High School attendance zone to unequal educational opportunities, in violation of the Fourteenth Amendment to the United States Constitution, by "feeding" a disproportionate number of at-risk students into the zone.

States Constitution, U.S. Const. amend. XIV, § 1.  (Doc. 1-2.)  On April 3, 2008, the School Board removed this matter from the Twenty-Third Judicial District Court, Parish of Ascension, State of Louisiana to the United States District Court for the Middle District of Louisiana.  (Doc. 1.)  Subsequently, Lewis filed a First Amended Complaint and a Second Amended Complaint.  (Docs. 26, 97.)

Lewis's First Amended Complaint alleges that the School Board's "actions since the construction of Dutchtown High School and in the adoption of Plan 2f were taken to ensure that East Ascension High School would maintain a disproportionately large non-white minority population, leaving the remaining two East Bank schools as predominantly white."  (Doc. 26, ¶ 13.)  Lewis further alleges that Option 2f feeds a disproportionate number of at-risk[11] students in the East Ascension High School attendance zone thereby "ensur[ing] that the non-white minority students at East Ascension High School would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School."  (Doc. 26, ¶ 15.)  Lewis does not allege that at-risk students are a suspect class for equal protection purposes.[12]  Rather, he alleges that nonwhite students are being discriminated against based upon their race as a result of a

[11] "At-risk" students are those who are eligible for free or reduced-price lunch due to disadvantaged socioeconomic status.  *Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 346, n. 7 (5th Cir. 2011).

[12] Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, certain classes of persons are considered "protected" or "suspect."  To establish a claim under the Equal Protection Clause, a plaintiff must prove that:(1) a state actor intentionally discriminated against him or her because of his or her membership in a protected class; or (2) he or she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *Gibson v. Tex. Dept. of Ins.-Div. of Workers Comp.*, 700 F.3d 227, 238 (5th Cir. 2012).

disproportionate influx of at-risk students into the East Ascension High School attendance zone.[13]  (Doc. 26, ¶ 15.)

### C.    Procedural History

On April 30, 2009, the School Board filed a motion to dismiss or for summary judgment.  (Docs. 36, 40.)  Lewis filed a memoranda in opposition, but did not cross-move for summary judgment.  (Docs. 45, 49.)  Subsequently, this Court adopted the Magistrate Judge's Report and Recommendation, granted the School Board's motion for summary judgment, dismissed Lewis's claims, and entered a judgment in favor of the School Board.  (Docs. 61, 66, 67.)  Lewis appealed the District Court's ruling and judgment, in part.  (Doc. 68.)

On appeal, the United States Court of Appeals for the Fifth Circuit, affirmed in part and reversed and remanded in part.  (Doc. 76.)  Specifically, the Court  held that "[b]ecause factual questions exist as to whether Option 2f had both a racially discriminatory motive and a disparate impact, and the court misapprehended the significance of the evidence before it, the court erred in awarding summary judgment under a rational basis test ." *See Lewis v. Ascension Parish Sch. Bd.*, 662 F.3d 343, 352 (5th Cir. 2011).  The Fifth Circuit concluded that "[t]he standard of review, whether strict scrutiny or rational basis, turns on factual questions of discriminatory motive

---

[13] Subsequently, Lewis further amended his claim to include the allegation that Option 2f denies nonwhite students at East Ascension High School *and* nonwhite middle and primary school students in the East Ascension High School feeder zone educational opportunities equal to those available to white students at Dutchtown High School and St. Amant High School *and* white middle and primary school students in the Dutchtown High School and St. Amant High School feeder zones.  *See* Doc. 183.

and impact" *Id.* Accordingly, "[f]urther factual development [wa]s required." *Id.* at 344. The court further emphasized:

> No doubt the district had a responsibility to address overcrowding in Dutchtown High School. It could not, however, do so by assigning individual students among the schools based upon disadvantaging one race over another in the assignment of at-risk students, even if the motive in doing so is the "benign" motive of "maintaining unitary status." The standard of review, whether strict scrutiny or rational basis, turns on the factual questions of discriminatory motive and impact.

*Id.* 352.

In accordance with the Fifth Circuit's decision, the Court granted the parties time to conduct additional discovery. (Docs. 80, 84, 104.) Following additional discovery, the parties filed cross motions for summary judgment. (Docs. 107, 108.) After careful review of the summary judgment evidence, the Court denied Lewis's motion for summary judgment and granted in part and denied in part the School Board's motion for summary judgment. (Doc. 183.) Specifically, the Court dismissed Lewis's claim that Option 2f employs an explicit racial classification. (Doc. 183, p. 27.) The Court also denied the School Board's request that the Court dismiss Lewis's Equal Protection Clause claim on the basis that Varando and Child B were similarly situated to white students in the East Ascension High School attendance zone. (Doc. 183, p. 30.) The Court further denied the School Board's request that the Court dismiss Lewis's Equal Protection Clause claim because genuine disputes of material fact existed as to: (1) whether Option 2f has a discriminatory impact on nonwhite students in the East Ascension High School attendance zone; and (2) whether the School Board acted with a discriminatory purpose when it adopted Option 2f. (Doc. 183, pp. 32, 38.)

Neither party filed a motion for reconsideration[14] or appealed the Court's Ruling and Order denying Lewis's motion for summary judgment and granting in part and denying in part the School Board's motion for summary judgment to the Fifth Circuit.

On February 18, 2014, this matter came before the Court for a non-jury trial on the merits. (Docs. 195, 196.) Following the trial on the merits, the parties were granted leave to file post-trial briefs, including proposed findings of fact and conclusions of law. (Docs. 190, 191, 194.)

## IV. FINDINGS OF FACT

The following findings of fact are uncontroverted or supported by the evidence in the record. Where a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

1. In the early 2000's, Ascension Parish began experiencing significant population growth in the Dutchtown area of the Parish.

2. In 2002, the United States Department of Justice approved the School Board's plan to address the population growth in the Dutchtown area by constructing

---

[14] Prior to the trial on the merits, counsel for the School Board orally requested that the Court reconsider its conclusion regarding who is "similarly situated" to Varando and Child B. The Court denied counsel's request, without prejudice to the School Board's right to re-urge such request in its post-trial brief. Trial Transcript, Vol. I, 36-40, February 18, 2014. Counsel for the School Board also orally requested that the Court: (1) reconsider whether a finding of discriminatory purpose *only* is sufficient to apply strict scrutiny review; (2) reconsider or "leave open a decision" on the nature of discriminatory intent to be proven at trial; and (3) reconsider or "leave open a decision" on whether Lewis should be permitted to broaden the scope of his remaining Equal Protection Clause claim. The Court denied counsel's requests, without prejudice to the School Board's right to re-urge such requests in its post-trial brief. Trial Transcript, Vol. I, 40-43, February 18, 2014. The School Board failed to re-urge all but it its argument that Varando and Child B are similarly situated to white students in the East Ascension High School attendance zone and *not* similarly situated to white students in the Dutchtown High School and St. Amant High School attendance zones. (Doc. 191.) Accordingly, the School Board's other requests are deemed abandoned.

Dutchtown High School and implementing a new school attendance zone "feeder plan" that included the newly-constructed Dutchtown High School. However, by 2006, the enrollment at Dutchtown Middle School, a Dutchtown High School feeder school, had risen to more than 1,000 students.

3. In 2004, following this Court's dismissal of a longstanding desegregation case against the District, the School Board began exploring alternative solutions to student population growth in the Dutchtown area. Later that year, the School Board established a "Growth Impact Committee."

4. On December 7, 2004, School Board member and Growth Impact Committee Chairman Troy James Gautreau, Sr.[15] ("Gautreau") presented a "Growth Impact Charter" to the School Board. The Charter included the following Committee "objectives": (1) "[d]evelop a plan to address the growth with minimal impact on residents;" (2) "[e]nsure equal facilities and instructional quality for all children in Ascension Parish;" (3) "[e]nrollment [m]aximums - [e]lem[entary] 500 students - [m]iddle 750 students - [h]igh [school] 1500 students;" and (4) "[m]aintain unitary status."

5. According to Songy, the District's goal was to move approximately 450 students out of the Dutchtown Middle School attendance zone, and thus, out of the Dutchtown High School attendance zone, and into other east bank schools with capacity for growth.

---

[15] Gautreau is now President of the School Board.

6.     Prior to the School Board's adoption of Option 2f, the School Board held several

       public meetings, during which it afforded members of the public the opportunity

       to comment on the proposed attendance re-zoning plans.

7.     To facilitate the School Board's assessment of potential attendance re-zoning

       plans, Songy, Gautreau, and other members of the School Board requested

       Demographics Application Specialist David Duplechein ("Duplechein") generate

       demographic data for several plans.

8.     Using the District's "Edulog"[16] computer program, Duplechein projected the

       demographic effects of potential school attendance re-zoning plans using the

       residential addresses of currently enrolled students.

9.     In 2004, Gautreau presented a PowerPoint presentation to the School Board and

       unidentified District Administrators entitled, "East Side Re-district Impact."

10.    Gautreau's presentation concluded that the 2002 school attendance zone "feeder

       plan" had not alleviated the overcrowding issues plaguing several of the

       District's primary and middle schools.

11.    Gautreau's presentation also showed that, since the implementation of the 2002

       school attendance zone "feeder plan," the percentage of at-risk students at the

       primary schools in the East Ascension High School feeder zone had increased,

       and the average School Performance Scores ("SPS") at the primary schools in the

       East Ascension High School feeder zone had decreased. Gautreau's presentation

_____

       [16] According to Songy, Edulog was used to "geographically code all students actually enrolled in
the school system based on their physical residential addresses and to project the statistical effects of
various rezoning options."

also showed an increase in the percentage of at-risk students and lower average SPS scores at middle schools in the East Ascension High School feeder zone. Gautreau's presentation further showed decreased student enrollment, an increase in the percentage of at-risk students, lower average SPS scores, and lower standardized test scores at East Ascension High School.

12. Gautreau's presentation also included a delineated list of the "effects" of a higher at-risk student population, including: (1) an "[i]ncrease in discipline problems;" (2) "[i]ncrease[d] pressure for high stakes testing;" and (3) an "[i]ncrease [in] teacher frustration and lower morale."

13. Gautreau's presentation further emphasized that ". . . '**the concentration of poverty within a school can be shown to be harmful to all students in that school whether or not an individual student comes from a poor background**.' . . . Therefore[,] a higher percentage of majority students should increase at risk achievement."  (emphasis in original).

14. It is unclear whether Gautreau developed this PowerPoint presentation using demographic data from the Edulog computer program.

15. It is also unclear how many, if any, School Board members considered this PowerPoint presentation when they voted to adopt Option 2f.

16. Subsequently, Gautreau prepared another PowerPoint presentation, entitled "Proposed Re-districting Options."  Gautreau presented this PowerPoint presentation to the School Board in 2006 or 2007.

17.   Gautreau's presentation examined what he identified as the "Duplessis Feeder Option" (i.e., Option 2f) and the "Prairieville Feeder Option" (i.e., Option 3). Specifically, Gautreau examined the: (1) then-current racial demographics at each of the high schools; (2) projected total enrollment at several primary schools under the Duplessis Feeder Option and Prairieville Feeder Option; (3) projected the total enrollment at several middle schools under the Duplessis Feeder Option and Prairieville Feeder Option; (4) projected the percentage of "black" versus "white" students at several primary schools under the Duplessis Feeder Option and Prairieville Feeder Option; (5) projected the percentage of "black" versus "white" students at several middle schools under the Duplessis Feeder Option and Prairieville Feeder Option; (6) projected the percentage of "Title I" versus "paid" students at several primary schools under the Duplessis Feeder Option and Prairieville Feeder Option; and (7) projected the percentage of "Title I" versus "paid" students at several middle schools under the Duplessis Feeder Option and Prairieville Feeder Option.

18.   Gautreau concluded that "[t]he Prairieville proposal clearly offers the best opportunity for all students in Ascension [P]arish and avoids putting an undue burden on one particular school by increasing the at risk student population."

19.   It is unclear whether Gautreau developed this PowerPoint presentation using demographic data from the Edulog computer program.

20.   It is also unclear how many, if any, School Board members considered this PowerPoint presentation when they voted to adopt Option 2f.

21.    Sometime after 2007, Gautreau created a chart using demographic data from the Edulog computer program. The chart included projections of the total enrollment, "Minority %," and "At-Risk %" at each of the three high schools on the east bank under "Option 2," "Option 2c," "Option 2d," "Option 2e," "Option 2f," and "Option 3."

22.    Specifically, Gautreau's chart showed that Option 2f would result in an increase in student enrollment at East Ascension High School from 1,241 in 2007 to 1,658 in 2012; an increase in student enrollment at Dutchtown High School from 1,695 in 2007 to 1,751 in 2012; and an increase in student enrollment at St. Amant High School from 1,633 in 2007 to 1,762 in 2012.

23.    Gautreau's chart also showed that Option 2f would result in an increase in "Minority %" at East Ascension High School from 43 percent in 2007 to 47 percent in 2012; a decrease in "Minority %" at Dutchtown High School from 26 percent in 2007 to 25 percent in 2012; and an increase in "Minority %"at St. Amant High School from 12 percent in 2007 to 15 percent in 2012.

24.    Gautreau's chart further showed that Option 2f would result in an increase in "At-Risk %" at East Ascension High School from 43 percent in 2007 to 57 percent in 2012; an increase in "At-Risk %" at Dutchtown High School from 19 percent in 2007 to 26 percent in 2012; and an increase in "At-Risk %"at St. Amant High School from 24 percent in 2007 to 36 percent in 2012.

25.    It is also unclear how many, if any, School Board members considered this chart when they voted to adopt Option 2f.

26. On or about January 15, 2008, Songy created a chart entitled, "Statistical Analysis of Options 1, 2, 2f, and 3." Using the demographic data generated by Duplechein using the Edulog computer program, Songy projected the total enrollment, percentage of "African-American" students, and percentage of "free and reduced lunch" students at each of the "K-5," "K-8," "6-8," and "9-12" schools on the east bank under four potential attendance re-zoning plans (i.e., Option 1, Option 2, Option 2f, and Option 3).

27. Songy's chart showed that, upon implementation of Option 2f, enrollment at East Ascension High School would increase from 1,194 to 1,566 students; enrollment at Dutchtown High School would decrease from 1,670 to 1,374 students; and enrollment at St. Amant High School would increase from 1,585 to 1,605 students.

28. Songy's chart also showed that, upon implementation of Option 2f, the percentage of African American students at East Ascension High School would decrease from 35.1 percent to 32 percent; the percentage of African American students at Dutchtown High School would increase from 19.5 percent to 21 percent; and the percentage of African American students at St. Amant High School would increase from 9.8 percent to 10 percent.

29. Songy's chart further showed that, upon implementation of Option 2f, the percentage of "free and reduced lunch" students at East Ascension High School would decrease from 40.3 percent to 37 percent; the percentage of "free and reduced lunch" students at Dutchtown High School would decrease from 18.4

percent to 18 percent; and the percentage of "free and reduced lunch" students at St. Amant High School would increase from 24.1 percent to 25 percent.

30. Songy's chart included projections based on the District's October 2007 student enrollment data only. In other words, Songy's chart did not project the enrollment and demographic effects of the four potential school attendance re-zoning plans beyond the 2007-2008 school year.

31. Songy's chart also included enrollment and demographic projections for six primary schools that did not exist at the time of the vote.[17]

32. Immediately before the January 15, 2008 School Board meeting, Songy provided each School Board member with a copy of the "Statistical Analysis of Options 1, 2, 2f, and 3" chart. As such, each School Board member was in possession of Songy's chart at the time of the vote.

33. It is unclear which, if any, School Board members were in possession of Gautreau's chart and/or PowerPoint presentations at the time of the vote.

34. On January 15, 2008, the School Board met in a regular session at a public Board meeting at the Courthouse in Gonzales, Louisiana.

35. Item thirteen on the School Board's agenda was the adoption of revised school attendance zones.

36. Prior to the vote, Gautreau addressed the School Board and the public. According to Gautreau, an important criteria when selecting a school attendance

---

[17] The Option 2f "Boundary Implementation Schedule" indicates that Prairieville Middle and Pecan Grove Primary opened in Fall 2008, and Bluff Primary (i.e., Spanish Lake Primary) and Central Primary opened in Fall 2009. The Schedule does not included opening dates for Lakeside Primary or Orange Grove Primary (i.e., Sorrento Primary).

rezoning plan was maintaining the District's current unitary status and moving the least amount of students as possible. Gautreau informed the public that Option 2f or Option 3 needed to be passed by the School Board that night, and that some people would be upset with the School Board's decision.[18]

37.    After motions to adopt Option 2f and Option 3 were made and seconded, and each School Board member offered opinions on the best option, the floor was opened for public comment only. Nineteen members of the public made comments on the record.

38.    Neither party submitted into evidence a transcript of each Board member's comments, nor a transcript of the public comments.

39.    Following the public comments, the School Board took a vote on Option 3. Four School Board members voted for the plan: Kerry Diez ("Diez"), Gautreau, John Murphy ("Murphy"), and Patricia Russo ("Russo"). Six School Board members voted against the plan: Steve Broussard ("Broussard"), Catherine Davis ("Davis"), Jody Elisar ("Elisar"), Harold Jarreau ("Jarreau"), Taft Kleinpeter ("Kleinpeter"), and A.J. Nickens ("Nickens").[19] Accordingly, the motion to adopt Option 3 failed.

40.    Next, the School Board took a vote on Option 2f. Six School Board members voted for Option 2f: Broussard, Davis, Elisar, Jarreau, Kleinpeter, and Nickens.

---

[18] The Court notes that neither party presented evidence to explain what Gautreau meant by this comment, or to verify Gautreau's prediction.

[19] According to the meeting minutes, School Board member Edward Price ("Price") did not cast a vote.

Four School Board members voted against Option 2f: Diez, Gautreau, Murphy, and Russo.[20] Accordingly, the motion to adopt Option 2f passed.

41. Four of the six School Board members who voted for Option 2f testified during the trial. All four testified that they were aware of the demographic projections under Option 2f at the time of the vote.

42. Four of the six School Board members who voted for Option 2f testified that, at the time of the vote, they were aware that students who receive free or reduced lunch (i.e., "at-risk") often experience more academic challenges and have lower standardized test scores than students who do not.

43. During the trial, Songy, the current Superintendent, Dr. Pujol, and former School Board member Davis testified that the District, through funding from the federal government, provides additional resources to schools with high number or high percentages of students from low-income families (i.e., Title I schools).[21]

44. During the trial, Dr. Pujol further testified that: (1) the District hires "premier professionals" at East Ascension High School; (2) the District has not had

---

[20] According to the meeting minutes, School Board member Edward Price ("Price") did not cast a vote.

[21] Title I, Part A of the Elementary and Secondary Education Act of 1965 ("Title I"), 20 U.S.C. § 6301, *et seq.*, as amended, provides financial assistance to local educational agencies and schools with high number or high percentages of children from low-income families to help ensure that all children meet challenging state academic standards. http://www2.ed.gov/programs/titleiparta/index.html. In accordance with the statute, "Title I schools with percentages of students from low-income families of at least 40 percent may use Title I funds, along with other Federal, State, and local funds, to operate a 'schoolwide program' to upgrade the instructional program for the whole school. Title I schools with less than the 40 percent schoolwide threshold or that choose not to operate a schoolwide program offer a 'targeted assistance program' in which the school identifies students who are failing, or most at-risk of failing, to meet the State's challenging academic achievement standards." http://www2.ed.gov/programs/titleiparta/index.html.

difficulty recruiting teachers to work at schools in the East Ascension High School attendance zone; (3) the District has not had more difficulty retaining teachers at schools in the East Ascension High School feeder zone versus the two other attendance zones; (4) the teacher turnover rate at each of the high schools on the east bank is the same; (5) students at each of the high schools on the east bank are offered the same courses; (6) the course curriculum at each of the high schools on the east bank is the same; and (7) each of the high schools on the east bank experienced roughly the same amount of discipline issues. Such evidence was not refuted by Lewis.

45. Option 2f was implemented beginning with the 2008-2009 school year.

46. Under Option 2f, students on the east bank of the Mississippi River are assigned to schools, and thus, a school attendance zone, based on their physical residential address.

47. Under this "feeder plan," each primary school "feeds" into a specific middle school, which in turn "feeds" into a specific high school.

48. The hard-copy documents that make up Option 2f consist of boundary maps, geographical descriptions of the school attendance zones, and a feeder plan chart. None of the hard-copy documents that make up Option 2f mention race or the socioeconomic status of the District's students.

49. Option 2f re-drew the school attendance zone lines so that several students from the Dutchtown attendance zone and the St. Amant High School attendance zone were moved to the East Ascension High School attendance zone. As a result of

the School Board's implementation of Option 2f, 339 students were placed in a different school attendance zone during the 2008-2009 school year.

50.     Option 2f also moved Duplessis Primary School, a Title I school, from the Dutchtown High School attendance zone to the East Ascension High School attendance zone.  As result, all five of the primary schools in the East Ascension High School attendance zone are Title I schools.

51.     Option 2f further assigned one new middle school to the East Ascension High School attendance zone (i.e., Central), two new primary schools to the Dutchtown High School attendance zone (i.e., Prairieville and Spanish Lake), one new primary school to the East Ascension High School attendance zone (i.e., Pecan Grove), and three new primary schools to the St. Amant High School attendance zone (i.e., Lakeside, Sorrento, St. Amant).

52.     The Louisiana Department of Education's official enrollment data reflects the following changes in total student enrollment at each of the east bank high schools since the Board's implementation of Option 2f:

**Total Student Enrollment - October 2007**[22]

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 1189 | 1666 | 1594 |

---

[22] The Louisiana Department of Education collected the October 2007 data immediately prior to the School Board's adoption of Option 2f.

**Total Student Enrollment - October 2008**[23]

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 1315 | 1728 | 1641 |

**Total Student Enrollment - October 2013**[24]

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 1835 | 1997 | 1892 |

53.    The Louisiana Department of Education's official enrollment data reflects the following changes in racial demographics at each of the east bank high schools since the Board's implementation of Option 2f:

**Percentage of Nonwhite Students - October 2007**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 42.1% nonwhite | 25.1% nonwhite | 12.1% nonwhite |

**Percentage of Nonwhite Students - October 2008**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 42.51% nonwhite | 25.64% nonwhite | 13.10% nonwhite |

**Percentage of Nonwhite Students - October 2013**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|:---:|:---:|:---:|
| 52.8% nonwhite | 28.04% nonwhite | 12.1% nonwhite |

---

[23] The Louisiana Department of Education collected the October 2008 data the school year in which Option 2f was implemented.

[24] The data collected by the Louisiana Department of Education in October 2013 represents current data, as of the date of the trial.

20

54.   The Louisiana Department of Education's official enrollment data reflects the

following changes in socioeconomic demographics at each of the east bank high

schools since the Board's implementation of Option 2f:

**Percentage of At-Risk Students - October 2007**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|---|---|---|
| 40.37% | 18.37% | 24.40% |

**Percentage of At-Risk Students - October 2008**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|---|---|---|
| 44.41% | 19.79% | 28.28% |

**Percentage of At-Risk Students - October 2013**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|---|---|---|
| 51.83% | 30.88% | 35.73% |

55.   It is undisputed that the average ACT scores for the 2013 graduating classes at

the three east bank high schools were as follows:

**Average ACT Score - Class of 2013**

| East Ascension High School | Dutchtown High School | St. Amant High School |
|---|---|---|
| 19.4 | 21.3 | 20.3 |

56.   Dr. Pujol testified that following implementation of the State of Louisiana's

requirement that all high school students take the ACT examination, the

average ACT score at all three high schools on the east bank declined.  Dr. Pujol

further testified that the average ACT score at St. Amant High School fell by 1.2

points, Dutchtown High School by 0.5 points; and East Ascension High School 0.1 points.

57.   According to the Louisiana Department of Education, since the implementation of Option 2f, School Performance Scores ("SPS")[25] at schools in the East Ascension High School attendance zone have increased.

58.   In 2012 and 2013, East Ascension High School received an "A" rating from the Louisiana Department of Education.

59.   In 2013, East Ascension High School was ranked in the top ten percent of all state high schools without selective admission standards, the highest in-state ranking ever in its history.

60.   According to Dr. Pujol's uncontroverted testimony, the graduation rate at East Ascension High School is currently at its highest rate.

61.   Lewis failed to produce any other evidence regarding student performance at schools in the East Ascension High School attendance zone.

## V.   CONCLUSIONS OF LAW

### A.   42 U.S.C. § 1983

"Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' . . . [T]his provision [also] safeguards certain rights conferred by federal statutes."

---

[25] SPS scores are calculated based on a formula set by the Louisiana Department of Education, and represent an average of the scores for the varied standardized tests that are taken by the individual students at each school.

*Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).

Here, the gravamen of Lewis's Section 1983 claim is that the School Board has denied nonwhite students in the East Ascension High School attendance zone equal educational opportunities, in violation of the Fourteenth Amendment, by adopting a school rezoning plan that "feeds" a disproportionate number of at-risk students into the East Ascension High School attendance zone.

### 1. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The central purpose of the Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Indeed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tx. at Austin*, 133 S. Ct. 2411, 2418, 186 L. Ed. 2d 474, 485 (2013) (internal quotations and citations omitted). "[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications . . . be subjected to the most rigid scrutiny." *Id.* at 2418-19, 485 (internal quotations and citations omitted). Accordingly, "[l]aws that explicitly distinguish between individuals on racial grounds fall within the core" of the Equal Protection Clause's prohibition,

*Reno*, 509 U.S. at 642, and are subject to strict scrutiny, *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999). However, a government action does not necessarily purposely discriminate merely because it is race-related. *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543-544 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2773, 183 L. Ed. 2d 639 (2012) (citing *Crawford v. Bd. of Educ.*, 458 U.S. 527, 538 (1982)). To state an Equal Protection claim, a plaintiff must show that a "challenged government action classifies or distinguishes between two or more relevant groups." *Cornerstone Christian Schools v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009) (quoting *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993) (internal quotations omitted).

A violation of the Equal Protection Clause can be shown when: (1) a law or policy explicitly classifies on the basis of race; (2) a facially neutral law or policy is applied differently on the basis of race; or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact. *Lower Merion*, 665 F.3d at 543 (citing cases).

### i. Intentional Discrimination Shown by a Racial Classification

A "racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Indeed, "[i]t is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720; *see also Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). "A statute or policy utilizes a

'racial classification' when, on its face, it explicitly distinguishes between people on the basis of some protected category." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999) (citing cases).

Here, Lewis alleges that Option 2f expressly classifies students on the basis of race. The Court concludes that this argument is without merit.

First, as noted above, the Court previously rejected Lewis's claim that Option 2f employs an explicit racial classification in its Ruling and Order denying Lewis's motion for summary judgment and granting in part and denying the School Board's motion for summary judgment. (Doc. 183.) As also noted above, Lewis failed to file a motion for reconsideration or seek appeal of the Court's Ruling and Order to the Fifth Circuit.

Second, a review of the evidence supports the conclusion that Option 2f does not employ an explicit racial classification. Option 2f is facially race neutral, assigning students to schools based solely on the geographical area in which they live. Option 2f, on its face, neither uses racial classification as a factor in school assignments, nor distributes any burdens or benefits on the basis of racial classification. Indeed, Lewis failed to point to any provision of Option 2f that classifies students on the basis of race, or uses race as a factor in school assignment.

Further, the School Board's consideration of the projected enrollment and percentage of nonwhite and "at-risk" students under the potential school attendance rezoning plans does not amount to a rezoning plan that assigns students on the basis of race. *Parents Involved*, 551 U.S. at 745 (the prohibition against racial classifications

"ha[s] nothing to do" with the use of racial demographic data in policymaking, so long as the policy itself does not classify people on the basis of race). This conclusion is consistent with cases decided in other Circuits, as well as the Supreme Court. *See, e.g.*, *Spurlock v. Fox*, 716 F.3d 383, 394 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 436, 187 L. Ed. 2d 283 (2013); *Lower Merion Sch. Dist.*, 665 F.3d at 529; *Parents Involved*, 551 U.S. at 745.

In sum, the Court finds that the record evidence in this case does not support the conclusion that Option 2f employs an explicit racial classification.

### ii. Intentional Discrimination Shown by Discriminatory Application of a Facially Neutral Law or Policy

The second alternative to establish a violation of the Equal Protection Clause is to show that a facially neutral law or policy is applied differently on the basis of race, is also inapplicable here. There is no evidence that the District has applied Option 2f differently on the basis of race. Indeed, Lewis failed to present any evidence that the District enforces Option 2f in some areas of the Parish or against some students while not enforcing Option 2f in other areas of the Parish or against other students. In other words, Lewis does not allege, nor did he present any evidence, that Option 2f is enforced in a discriminatory manner.

### iii. Intentional Discrimination Shown by a Facially Neutral Law or Policy that is Applied Evenhandedly, is Motivated by Discriminatory Purpose or Intent, and Has a Racially Discriminatory Impact

To establish a violation of the Equal Protection Clause under the third alternative, the plaintiff must prove that the government action: (1) had a discriminatory effect; and (2) was motivated by a discriminatory purpose. *Village. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977), *Davis*, 426 U.S. at 239-42. If Option 2f is found to have a discriminatory impact and the School Board is found to have acted with a discriminatory purpose, strict scrutiny places the burden on the School Board to prove that its actions were narrowly tailored to achieve a compelling government interest. *Parents Involved*, 551 U.S. at 720.

### a. Discriminatory Impact

Although discriminatory impact alone is not dispositive, a plaintiff must show discriminatory impact in order to prove an equal protection violation. Discriminatory impact must be shown to establish an equal protection violation because "plaintiffs must show that they have been injured as a result" of the government action to ensure that courts "can impose a meaningful remedy." *Lower Merion*, 665 F.3d at 550-51 (quoting *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991)). Indeed, "no case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).

## 1.    Similarly Situated Requirement

As a prerequisite to an equal protection claim, "the plaintiff must prove that similarly situated individuals were treated differently."[26] *Baranowski v. Hart*, 486 F.3d 112, 123 (5th Cir. 2007), *cert. denied*, 552 U.S. 1062 (2007)*; Bryan v. City of Madison*, 213 F.3d 276, (5th Cir. 2000) (citing *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999)).  *See also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike").  Supreme Court precedent holds that "similarly situated" persons are those persons who are standing in the same situation as the plaintiffs in relation to the challenged government action.  *Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("The concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged.").

The Fifth Circuit has made clear that "there is no precise formula to determine whether an individual is similarly situated to comparators."  *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012).  Rather, the "similarly situated" inquiry "depend[s] substantially on the facts and context of the case," "is case-specific," and "requires [the court] to consider 'the full variety of factors that an objectively

---

[26] As noted by the United States Court of Appeals for the Tenth Circuit, "[i]t is this comparative element that distinguishes the Equal Protection Clause from the Due Process Clause." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213 (10th Cir. 2004) (citing *Ross v. Moffitt*, 417 U.S. 600, 609 (1974) ("Due process emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated.  'Equal protection,'on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.")).

reasonable . . . decisionmaker would have found relevant in making the challenged decision.'" *Id.*, at 233-34 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007)). *See also Jennings*, 383 F.3d at 1214 ("the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case.").

First, the Court must determine whether nonwhite students in the East Ascension High School attendance zone are similarly situated to white students in the same attendance zone *or* white students in the Dutchtown High School and St. Amant High School attendance zones. As noted above, the white comparators must be those students who stand in the same situation as the nonwhite students in the East Ascension High School attendance zone in relation to the challenged government action.

Neither party cited to, nor has the Court identified, a factually analogous case in the Fifth Circuit. However, the United States Court of Appeals for the Third Circuit recently confronted a similar issue in *Lower Merion*. There, the court considered whether the school redistricting plan in Lower Merion, Pennsylvania discriminated against nonwhite students on the basis of race, in violation of the Equal Protection Clause. *Id.*, 665 F.3d 524 (3d Cir. 2011). Like the case at bar, Lower Merion's rezoning "feeder plan" reassigned students to schools within the school district based on their physical address. The plaintiffs were African American students who lived in an area that was redistricted to a different school. In determining whether the plaintiffs had established discriminatory impact, the Third Circuit first considered whether the

plaintiffs had established that similarly situated students of a different race were treated differently. *Id.* at 550. The Third Circuit concluded that the plaintiffs failed to meet this burden:

> . . . Appellants have not provided any evidence that Plan 3R treats similarly situated individuals of a different race in a different manner. Along with Students Doe, all white students in the Affected Area are also assigned to attend Harriton without the choice to attend LMHS . . . . Appellants have not provided any evidence that Plan 3R treats black individuals outside of the Affected Area in the same way in which it treats Students Doe or other black individuals who live in the Affected Area. North Ardmore, like the Affected Area, has a high percentage of African-American residents in comparison to other areas. However, all of the students in North Ardmore, both black and white, are assigned to attend LMHS, not Harriton, where Students Doe and Affected Area students are assigned. Two-thirds of the students redistricted to Harriton were students who were not African-Americans and who lived in the Affected Area or other areas redistricted to Harriton under plan 3R. Plan 3R does not treat black students in the Affected Area and North Ardmore similarly, nor does it treat white students in either area similarly to other white students or differently from the black students in the same area. . . .

*Id.*

Here, the record evidence shows that both nonwhite *and* white students are assigned to the East Ascension High School attendance zone. Indeed, according to the record evidence, 41.8 percent of the students assigned to East Ascension High School are white.

The record evidence further shows that both nonwhite *and* white students in the East Ascension High School attendance zone are assigned to schools in that zone without the choice to attend schools in the Dutchtown High School or St. Amant High School attendance zones. Indeed, the record evidence shows that nonwhite *and* white students are assigned to schools based on their physical residential address. As such,

white students in the East Ascension High School attendance zone are subjected to the same alleged academic conditions as nonwhite students in that zone.

By contrast, white students in the Dutchtown High School and St. Amant High School attendance zones are not subjected to the same alleged academic conditions as nonwhite students in the East Ascension High School attendance zone, as - based on Lewis's own allegations - a lower percentage of at-risk students attend schools in those attendance zones.

In other words, Lewis failed to prove by a preponderance of the evidence that nonwhite students in the East Ascension High School attendance zone stand in the same situation as white students in the Dutchtown High School and St. Amant High School attendance zones. Rather, the record evidence supports the conclusion that the students who stand in the same situation as the nonwhite students in the East Ascension High School attendance zone are the white students in that *same* zone. Accordingly, the Court concludes that nonwhite students in the East Ascension High School attendance zone are similarly situated to white students in the same zone and *not* white students in the Dutchtown High School and St. Amant High School attendance zones.

Further, Lewis failed to prove by a preponderance of the evidence that Option 2f treats similarly situated students of a different race in a different manner. Indeed, nothing in record supports the conclusion that nonwhite students in the East Ascension High School attendance zone are treated *differently* than white students in that attendance zone. Rather, the record evidence shows that Option 2f treats

nonwhite and white students in the East Ascension High School attendance zone the same. Indeed, Dr. Pujol's uncontroverted testimony was that nonwhite and white students in the East Ascension High School attendance zone are provided the same educational opportunities, course options, and quality of instruction.

In sum, the Court concludes that Lewis has failed to prove by a preponderance of the evidence that nonwhite students in the East Ascension High School attendance zone are similarly situated to white students in the Dutchtown High School and St. Amant High School attendance zones. The Court further concludes that Lewis has failed to prove by a preponderance of the evidence that Option 2f treats similarly situated students of a different race in a different manner.

## 2. Evidence of Discriminatory Impact

Even en if the Court were to conclude that Option 2f treats similarly situated students of a different race in a different manner, the record evidence does not support the conclusion that Option 2f has had a disproportionately adverse effect on nonwhite students in the East Ascension High School attendance zone.

It is undisputed that the majority of the District's nonwhite students attend schools in the East Ascension High School feeder zone. It is also undisputed that East Ascension High School is the only majority nonwhite high school in the District. It is further undisputed that one of the two middle schools and three of the five primary schools in the East Ascension High School attendance zone are majority nonwhite.[27]

---

[27] In contrast, none of the primary or middle schools in the Dutchtown High School feeder zone and only one of the primary schools in the St. Amant High School feeder zone are majority nonwhite.

During the trial, Lewis presented evidence that Option 2f has resulted in an increase in the nonwhite student population at schools in the East Ascension High School attendance zone:

### Percentage of Nonwhite Students at Schools in the East Ascension Parish Attendance Zone

|  | Percentage of Nonwhite Students - October 2007 | Percentage of Nonwhite Students - October 2008 | Percentage of Nonwhite Students - October 2013 |
|---|---|---|---|
| East Ascension High School | 42.1 | 42.51 | 52.8 |
| Central Middle | NA | NA | 36.7 |
| Gonzales Middle | 64.9 | 67.80 | 74.5 |
| Central Primary | 25.9 | 25.71 | 37.3 |
| Duplessis Primary | 36.3 | 36.82 | 40.0 |
| Gonzales Primary | 73.2 | 71.05 | 74.0 |
| G.W. Carver Primary | 63.2 | 70.20 | 75.1 |
| Pecan Grove Primary | NA | 69.01 | 75.7 |

The record evidence also shows that the majority of the District's at-risk students attend schools in the East Ascension High School feeder zone. It is also undisputed that East Ascension High School is the only majority at-risk high school in the District. It is further undisputed that all of the primary and middle schools in the East Ascension High School attendance zone are majority at-risk.[28]

During the trial, Lewis presented evidence that Option 2f has resulted in an increase in the at-risk student population at schools in the East Ascension High School attendance zone:

---

[28] In contrast, none of the primary or middle schools in the Dutchtown High School feeder zone and only two of the primary schools in the St. Amant High School feeder zone are majority at-risk.

**Percentage of At-Risk Students at Schools in the East Ascension Parish Attendance Zone**

| | Percentage of At-Risk Students - October 2007 | Percentage of At-Risk Students - October 2008 | Percentage of At-Risk Students - October 2013 |
|---|---|---|---|
| East Ascension High School | 40.37 | 44.41 | 51.83 |
| Central Middle | NA | NA | 51.69 |
| Gonzales Middle | 68.19 | 71.72 | 81.02 |
| Central Primary | 42.54 | 40.87 | 57.22 |
| Duplessis Primary | 38.08 | 38.83 | 56.74 |
| Gonzales Primary | 81.29 | 75.28 | 85.39 |
| G.W. Carver Primary | 72.37 | 74.69 | 85.33 |
| Pecan Grove Primary | NA | 72.53 | 84.47 |

In sum, the record evidence shows that the majority of the District's nonwhite students attend schools where the majority of students are at-risk. According to Lewis, a disproportionate amount of at-risk students at a school results in unequal educational opportunities for students at that school. As such, Lewis alleges that the at-risk student population in the East Ascension High School attendance zone has a disproportionately adverse impact on nonwhite students in that attendance zone.

However, evidence of an increase in the percentage of nonwhite and at-risk students at schools in the East Ascension High School zone, *without more*, is insufficient to establish disparate impact. Indeed, the Supreme Court has "rejected the idea that 'a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another.'" *Lewis v. Casey*, 518 U.S. 343, 375 (1996) (Thomas, J., concurring) (citing *Washington v. Davis*, 426 U.S. 229, 242

(1976)).  *See also Feeney*, 442 U.S. at 273 (recognizing "the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results.").  Indeed, "[d]isproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.  Standing alone, it does not trigger the rule . . . " *Washington*, 426 U.S. at 242.  As such, evidence that a greater proportion of at-risk students attend majority nonwhite schools, *without more*, is unavailing.

The only objective evidence of student performance introduced by Lewis at trial were the average ACT scores for the graduating class of 2013.  This data showed the following:

### Average ACT Score - Class of 2013

|  | National | Louisiana State | East Ascension High School | Dutchtown High School | St. Amant High School |
|---|---|---|---|---|---|
| # of Test Takers | 1,799,243 | 45,305 | 347 | 452 | 395 |
| Average ACT Score | 20.9 | 19.5 | 19.4 | 21.3 | 20.3 |

While the data shows a one or two point difference in the average ACT score for students at each high school, such evidence represents student performance on only one standardized test during 2013 only.  Such limited evidence, *without more*, is insufficient to establish a statistically significant difference in student performance at East Ascension High School.  Further, such evidence fails to establish lower student performance at the middle and primary schools in the East Ascension High School attendance zone.

During the trial, the School Board introduced the student performance scores for each of the schools in the District for multiple academic years. According to Dr. Pujol's uncontroverted testimony, student performance scores at the primary and middle school levels are based on standardized tests only.

In contrast, student performance scores at the high school level are calculated as follows: (1) 25 percent of the score is based on end-of-course test results; (2) 25 percent of the score is based on ACT scores; (3) 25 percent of the score is based on the number of students who graduate and receive a diploma within four years; and (4) 25 percent of the score is based on students' "graduation index" or credentials (i.e., advanced placement courses, entry-based certifications, etc.).

The record evidence shows that the student performance scores at East Ascension High School have gradually increased since the implementation of Option 2f. In 2012, East Ascension High School received student performance score of 127.3 and an "A" rating from the Louisiana Department of Education. In 2013, East Ascension High School received student performance score of 135.2 and an "A" rating from the Louisiana Department of Education.[29] In 2013, East Ascension High School was ranked number 17 out of 175 high schools in the state.

While East Ascension High School's 2013 student performance score was 28.1 points lower that Dutchtown High School and 14.5 points lower than St. Amant High School, Lewis failed to introduce evidence to establish that these differences are

---

[29] In 2013, the Louisiana Department of Education began calculating student performance scores using a 150-point scale, rather than a 200-point scale. In 2013, East Ascension High School received a student performance score of 135.2 and a "A" rating, which translated to a student performance score of 96.7 and a "B" rating on the 150-point scale.

statistically significant, or that such differences are the result of unequal educational opportunities due to a higher percentage of at-risk students at East Ascension High School. Lewis also failed to introduce evidence to establish that student performance scores at the primary and middle schools in the East Ascension High School attendance zone are the result of unequal educational opportunities due to a higher percentage of at-risk students at those schools.

Instead, Lewis points to the percentage of students at East Ascension High School who passed advance placement exams versus the percentage of students at Dutchtown High School and St. Amant High School who passed advanced placement exams during two academic years. While the record evidence shows that a lower percentage of students at East Ascension High School passed advanced placement exams during *one* academic year, Lewis failed to introduce evidence to establish that these differences are statistically significant, or the result of unequal educational opportunities due to a higher percentage of at-risk students at East Ascension High School. Further, Lewis failed to introduce evidence to establish a correlation between student performance on advanced placement exams and unequal educational opportunities at primary and middle schools in the East Ascension High School attendance zone.

Finally, Lewis presented the testimony of Percy Bates, Ph.D. ("Bates"), who was qualified as an expert on the impact of a disproportionate number of at-risk students on an academic environment.[30]

---

[30] The Court notes that Lewis failed to introduce Dr. Bates expert report into the trial record.

According to Dr. Bates, a "high concentration" of at-risk students at a school adversely affects the quality of the teachers and achievement of the students. Dr. Bates further testified that, in his opinion, the disproportionate number of at-risk students at East Ascension High School has negatively impacted the educational opportunities and academic achievement of the students. However, when questioned about the basis of his opinion, Dr. Bates testified that his opinion was based on the general research findings of other experts, student performance scores from 2006 and 2007, $i$LEAP[31] test scores from 2006 and 2007, and Gautreaux's projections.[32] Dr. Bates testified that he did not employ any accepted methodology, nor did he conduct a qualitative or quantitative analysis of any kind. Dr. Bates further testified that he did not consider student performance data for the years following the adoption of Option 2f; nor did he attempt to validate Gautreaux's projections.

According to Dr. Bates, Option 2f resulted in "clear and visible inequities" in teacher quality and academic performance among students. However, Dr. Bates failed to support this conclusion with any evidence or data. Indeed, when questioned whether he had conducted any research regarding the number or qualifications of teachers in the East Ascension High School attendance zone versus the other two attendance zones, Dr. Bates testified that he did not. Dr. Bates further testified that

---

[31] Louisiana tests students annually in English language arts, mathematics, science and social studies in 3rd through 8th grades. The current tests, known as LEAP and $i$LEAP, were developed especially for Louisiana. These tests include both multiple-choice questions and constructed-response items, which require students to compose an answer. In 2014-2015, students in grades 3-8 will take annual assessments in English language arts and mathematics that are fully aligned to the Common Core State Standards. http://www.louisianabelieves.com/assessment/annual-assessments.

[32] It is unclear from Dr. Bates's testimony which set of Gautreaux's projections he reviewed.

he had not researched the course offerings, curriculum, or quality of instruction at schools in the East Ascension High School attendance zone versus schools in the other two attendance zones.

According to Dr. Bates, Option 2f negatively impacted the quality of the educational opportunities offered to Varnado and Child B. However, when questioned about the basis of his opinion, Dr. Bates testified that he did not interview Varnado or Child B or attempt to determine what educational opportunities were offered to them when they attended schools in the East Ascension High School attendance zone.

Further, in Dr. Bates's opinion, "the heavy concentration of minority and at-risk students at East Ascension High School places an undue burden on *everyone* concerned: the school, the students, and the teaching staff."[33] Such a opinion supports the conclusion that nonwhite and white students in the East Ascension High School attendance zone were equally affected by the adoption of Option 2f.

It is clear from Dr. Bates's testimony that he formed his opinions based on educational research conducted by other experts and his own experiences evaluating other school districts. However, such generalized opinions are of little to no value to the Court because Dr. Bates failed to conduct an analysis of the evidence and data in *this* case. Indeed, it is uncontroverted that Dr. Bates did not evaluate any of the evidence or data made available after the implementation of Option 2f. While Dr. Bates's research findings in other districts and the general research findings of other

---

[33] Trial Transcript, Vol. III, 5-17, February 20, 2014 (emphasis added).

experts can be instructive, his failure to conduct an independent analysis in this case renders his opinions meaningless.

In sum, the Court concludes that Lewis has failed to prove by a preponderance of the evidence that nonwhite students in the East Ascension High School attendance zone are similarly situated to white students in the Dutchtown High School and St. Amant High School attendance zones. The Court further concludes that Lewis has failed to prove by a preponderance of the evidence that Option 2f treats similarly situated students of a different race in a different manner.

Even if the Court were to conclude that Option 2f treats similarly situated students of a different race in a different manner, Lewis has failed to establish by a preponderance of the evidence that Option 2f has had a disproportionately adverse impact on nonwhite students in the East Ascension High School attendance zone.

As noted above, in order to establish a violation of the Equal Protection Clause, some showing of injury must be made. *Arlington Heights*, 429 U.S. at 264-66; *Davis*, 426 U.S. at 239-42; *Palmer*, 403 U.S. at 224; *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1358-59 (4th Cir. 1989). Here, the record evidence casts considerable doubt on Lewis's allegation that Option 2f has resulted in unequal educational opportunities for nonwhite students in the East Ascension High School attendance zone.

Having failed to prove discriminatory impact by a preponderance of the evidence, Lewis cannot establish a violation of the Equal Protection Clause. Accordingly, the Court need not consider whether the School Board acted with a discriminatory intent or purpose.

## VI. Conclusion

The Court finds that Lewis has not satisfied his burden of proving by a preponderance of the evidence that the Ascension Parish School Board's adoption of Option 2f violates the Equal Protection Clause of the Fourteenth Amendment.

Accordingly,

**IT IS ORDERED** that Lewis's request for a judgment in his favor, injunctive and declaratory relief, punitive damages, and attorneys' fees and costs is **DENIED**.

**IT IS FURTHER ORDERED** that this matter is **DISMISSED**, with prejudice.

A final judgment shall issue by separate order.

Baton Rouge, Louisiana, this ___18___ day of December, 2014.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**